### Easton *v.* Washington County Insurance Company, Appellant.

30

Argued March 22, 1957.   Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

reargument refused January 22, 1958.

George Y. Meyer, with him H. Gilmore Schmidt and William W. Matson, for appellants.

George I. Bloom, with him Walter W. Riehl, and Bloom, Bloom & Yard, for appellees.

OPINION BY MR. JUSTICE COHEN, October 7, 1957:

Plaintiffs were the owners of a certain property in Washington County. On October 1, 1951, there stood on this property a two-story concrete block and frame building with a basement and sub-basement. Because of

the grade of the land the basement and sub-basement at the back of the building were exposed above the ground. The sub-basement extended under the building to a depth of approximately 20 feet and was divided into four separate rooms. One side of each room was unenclosed, and the rooms could be entered only from the unenclosed sides. Finished lumber and building materials were stored in these rooms and in the rear of the basement which was partitioned from the rest of the basement. In front of the building, along a railroad siding, plaintiffs had stored some lumber. To the rear were open yards in which plaintiffs had stored their less valuable lumber.

In the open yards was a small building commonly called a shed, open on all sides and roofed with tar paper, used to store gutters and some lumber.

Prior to October 1, 1951, the property was protected under insurance policies "[o]n the two story concrete block building . . . occupied for living apartments, offices, and *warehouse for lumber and builders' supplies.* . . .

"And on . . . lumber in *open yard adjacent* to the above described warehouse.

"Privilege granted to finish and complete." (Emphasis supplied).

On October 1, 1951, the original policies to the value of $100,000 were cancelled at the request of the assured because the buildings carried an excessively high rate; and insurance in the amount of $60,000 (divided equally among six companies) was placed only "on stock of lumber and builders' supplies in *open yards and sheds at the rear of assured's warehouse* at Washington County, Pa." (emphasis supplied). After the new policies totaling $60,000 were issued, plaintiffs constructed additional sheds in the open yards and stored lumber

therein. These policies were renewed until October 1, 1954.

A fire completely destroyed plaintiffs' building, including the lumber and building supplies which were stored therein, on March 15, 1954. The lumber in the open yards and at the railroad siding, however, was not damaged by the fire.

Plaintiffs sought to recover on the insurance for their losses, maintaining that the partitioned basement and rooms in the sub-basement were "sheds" within the meaning of the policies and that the contents—lumber and builders' supplies—were thus insured. All the companies refused their claim. Plaintiffs on March 11, 1955, instituted separate suits, (consolidated for trial), against the several insurance companies in the Court of Common Pleas of Washington County. The cases were tried on the following theories: (1) that the word "sheds" is broad enough to encompass within its meaning the basement structures at the bottom of the concrete block and frame building; (2) that though the contracts of insurance are apparently clear, when an attempt is made to apply their terms to the existing situation an ambiguity arises in that the word "sheds" could apply equally to the basement structures or to the small building in the open yard or to both; that a latent ambiguity having thus developed, evidence is admissible to denote the exact reference intended by the parties to be attributed to the word "sheds"; (3) that through fraud, accident or mistake coverage of the materials in the basements was not included in the insurance contracts and that, therefore, the contracts should be reformed to include such coverage.

The trial judge rejected the plaintiffs' first theory— that the basement structures were sheds. However, he determined that the word "sheds" in the insurance policies was latently ambiguous. He therefore admitted

evidence to establish the exact reference intended by the parties when using the word "sheds" and submitted this question to the jury.

Additionally, the trial judge admitted evidence to determine whether the parties, pursuant to an oral agreement made with the defendants' agent, intended to insure the basement structures but failed to include their understanding in the policies because of fraud, accident or mistake. This issue was also submitted to the jury.

The jury returned a verdict in favor of the plaintiffs, and the defendants moved for judgment n.o.v. and for a new trial. From the refusal of their motions by the court en banc, (the trial judge dissenting), and the entry of judgment upon the verdict, the defendants have brought these appeals.

The plaintiffs' contention that the basement storage areas are "sheds" cannot be sustained. Simple words of common usage in a policy of insurance will be construed in their natural, plain and ordinary sense. *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Ins. Co.*, 385 Pa. 394, 397, 123 A. 2d 413 (1956). It has not been suggested that the word "sheds" is a word of art or that it is not a simple word of common usage. We therefore construe it in its natural, plain and ordinary sense. The trial judge in his charge to the jury, quoting from numerous standard dictionaries,[1] stated: "the word 'shed', is defined as 'a *slight* structure built for shelter or storage; . . . a lean-to, or separate building open in front, an outbuilding, a hut, as a wagon shed.' . . . 'A small building *slightly* constructed and of simple form, usually one story high, and often

[1] Webster's New International Dictionary (1950 ed.) ; Funk & Wagnall's New Standard Dictionary; The Century Dictionary; Webster's Twentieth Century Dictionary.

with front or front and sides open; also a lean-to, as a wagon shed.' . . . 'A *slight* or *temporary* building; a large open structure for *temporary* storage of goods, as a shed on a wharf, a railway shed, a sheep shed, cattle shed.' " (Emphasis supplied). The dictionary's definition is consistent with the general usage of the word "sheds" and both are denotive of an unsubstantial structure created for a temporary purpose. Such a definition is wholly inapplicable to the basements of a permanent concrete block and frame two-story warehouse. Aside from the literal definition the word "sheds" is in no sense suggestive of the basements of a concrete and frame building even though the basements may be open on one side.

The meaning of the word "sheds" is plain, and there has been no suggestion that it was used in a special or technical sense. While the facts surrounding the making of a contract are admissible in evidence to help explain the meaning of language used in a contract,[2] if the meaning is plain[3] and the circumstances do not show that the language was used in a special or technical sense,[4] no such evidence can be submitted to a jury. See Restatement, Contracts §§230, 235(a), (b), (d), and comments (1932); 9 Wigmore, Evidence §§2460-

[2] *Betterman v. The American Stores Co.*, 367 Pa. 193, 203-204, 80 A. 2d 66 (1951); *United States National Bank v. Campbell*, 354 Pa. 483, 487-488, 47 A. 2d 697 (1946); *Swarthmore Boro. v. Philadelphia Rapid Transit Co.*, 280 Pa. 79, 84, 124 Atl. 343 (1924); *McMillin v. Titus*, 222 Pa. 500, 503, 509, 72 Atl. 240 (1909).

[3] *Atlantic Refining Co. v. Wyoming Nat'l Bank of Wilkes-Barre*, 356 Pa. 226, 233, 51 A. 2d 719 (1947); *Anstead v. Cook*, 291 Pa. 335, 337, 140 Atl. 139 (1927). *Cf. State Line & Sullivan R. R. Co. v. Lehigh Valley R. R. Co.*, 277 Pa. 227, 233, 120 Atl. 829 (1923).

[4] *Electric Reduction Co. v. Colonial Steel Co.*, 276 Pa. 181, 187-190, 120 Atl. 116 (1923). *Cf. D'Orazio v. Masciantonio*, 345 Pa. 428, 432, 29 A. 2d 43 (1942); *Lehigh & Wilkes-Barre Coal Co. v. Wright*, 177 Pa. 387, 35 Atl. 919 (1896).

2462 (3rd ed. 1940) (particularly note pp. 190-194); 3 Williston, Contracts §§609, 618, 629 (2nd ed. 1936). Accordingly, the trial judge was correct in rejecting the plaintiff's first theory.

The second theory of the plaintiffs is that the insurance contracts contain a latent ambiguity arising from the fact that while the original policies issued in 1951 used the plural "sheds" there, in fact, existed at that time only *one* shed in the open yard. From this circumstance the plaintiffs contend that the court below properly admitted evidence showing whether the word "sheds" was intended by the parties to cover the basement store rooms and correctly submitted this issue to the jury.

We are unable to agree. A latent ambiguity arises from extraneous or collateral facts which make the meaning of a written instrument uncertain although the language thereof be clear and unambiguous. *Metzger's Estate,* 222 Pa. 276, 71 Atl. 96 (1908). The usual instance of a latent ambiguity is one in which a writing refers to a particular person or a thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more. of them equally. See *Lycoming Mutual Insurance Co. v. Sailer,* 67 Pa. 108 (1870) (insurance policy covered a "hay house"; there were two "hay houses"); *Koplin v. Franklin Fire Insurance Co.,* 158 Pa. Super. 301, 44 A. 2d 877 (1945) . (plaintiff's two chicken houses were insured for different amounts; which was chicken house #1 and which was #2 within the designation of the policy?) See also 9 Wigmore, op. cit. supra, §2472.

Whether evidence of extrinsic circumstances is sufficient to create a latent ambiguity in a contract is a matter of law for the court. *Only after the court is satisfied that a latent ambiguity exists is the question of what the parties intended by language used in the*

*contract—taking into consideration the extrinsic facts and circumstances—an issue to be submitted to the jury. Waldman v. Shoemaker*, 367 Pa. 587, 592, 80 A. 2d 776 (1951); *Lycoming Mutual Insurance Co. v. Sailer*, 67 Pa. 108, 113 (1870). See also 3 Williston op. cit. supra, §616.

The mere fact that the plural "sheds" was used in the present policies when only one such structure existed in 1951 does not create an ambiguity. The effect of the policies is simply to insure the one existing shed and, further, to cover any other sheds which might be erected during the life of the policies to a total value of $60,000. If a policy of insurance were drawn to cover "horses" and the insured had but one horse at the time, certainly no such ambiguity would arise as would permit testimony that the policy was meant to cover the insured's cow as well. Simply because the plural "sheds" was used when· only one shed existed is not a sufficient reason for permitting evidence to be introduced in order to show that a structure which is clearly not a shed is a shed within the meaning of the contract on the theory that latent ambiguity exists.

Since the court should have, in the first instance, determined that there was no latent ambiguity in the contracts, it follows that the admission of evidence on the question whether the parties used the word "sheds" to include the basement storeroom, and the submission of this issue to the jury, was error.

The final theory of the plaintiffs is that they are entitled because of fraud, accident or mistake to have the policy reformed in order to carry out the full intent and agreement of the parties. They would have the coverage of the policy changed to read as follows: "On Stock of lumber and builders supplies in open yards and in a shed in the open yards; and in a shed or sheds consisting of (a) stalls in the sub-basement

of the assured's main building and basement warehouse, and (b) in the storage room in the rear of the basement warehouse, both being classified as storage shed or sheds although being part of the assured's building; and along Railroad siding about 300 yards South of assured's main building on Washington Road . . . ."

In support of this position Samuel Easton testified that the defendants' authorized agent agreed that the fire insurance policies when issued were to cover the lumber and builders' supplies which the plaintiffs had stored in the basement and sub-basement of their building with the understanding and agreement that they would construct a wall partitioning off the rear portion of the basement warehouse in such a manner that there would be no direct communication between the basement storage areas and any other part of the building. In addition, Easton testified that the agent agreed that after the construction of the partition the basement storage rooms would be classified as "sheds".

In order to obtain the reformation of a contract in equity, or a variance of the terms of a contract at law, the moving party is required to show by clear, precise and indubitable evidence either fraud or mutual mistake. *Brandolini v. Grand Lodge of Pennsylvania,* 358 Pa. 303, 305, 56 A. 2d 662 (1948) ; *Broida v. Travelers Insurance Co.,* 316 Pa. 444, 447, 175 Atl. 492 (1934) ; *Gianni v. Russell & Co.,* 281 Pa. 320, 325, 126 Atl. 791 (1924). The meaning of this requirement is that [plaintiffs'] "witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Broida v. Travelers Insurance Co.,* supra, 316 Pa. at 448. Furthermore, the

evidence must be established by *two witnesses* or by one witness and corroborating circumstances. *Brandolini v. Grand Lodge of Pennsylvania,* supra, 358 Pa. at 305; *Broida v. Travelers Insurance Co.,* supra, 316 Pa. at 448. Whether the plaintiffs' evidence met this standard and so justified the submission of their case to the jury is again a question of law for the court. *Gerfin v. Colonial Smelting & Refining Co.,* 374 Pa. 66, 68, 97 A. 2d 71 (1953); *Brandolini v. Grand Lodge of Pennsylvania,* supra, 358 Pa. at 305; *Broida v. Travelers Insurance Co.,* supra, 316 Pa. at 447.

Reviewing the evidence presented in the case before us, we find that the plaintiffs' evidence does not fulfill the standard of proof required to warrant submission of their claim to the jury.

Samuel Easton was the *only* witness to testify to the alleged fraud or mistake.[5] It is undenied that he knew that the building and its contents had been rated as a high risk by the insurance companies because of lack of fire protection. The evidence shows that the plaintiffs had argued strenuously with the insurance representatives for a lower rate without success. Under these circumstances it seems less than credible that the plaintiffs, by the addition of a wall separating the storage areas from the remainder of the building, thought that they could obtain on them the same lower fire insurance rate which applied to the materials stored in the open yards and in the open shed for which adequate fire protection was available.[6]

---

[5] In view of our disposition of the case it is not necessary for us to determine whether the defendants would be bound by the alleged representations of their agent.

[6] In view of our determination of the case we are not called upon to weigh the evidence presented on the issue of fraud or mistake. Were we so to do, however, we should find the following let-

We hold, in conclusion, that neither the issue of a latent ambiguity nor the question of mutual mistake

---

ter (which needs no comment) most persuasive in negating plaintiffs' contentions:

"November 5, 1951

Easton Lumber & Builders Supply Co.
R. D. #2
Canonsburg, Pa.

Attention: Mrs. Samuel Easton

Dear Mrs. Easton:

Confirming our phone conversation regarding your account we will try to explain it as follows:

On November 2, 1950 a policy was written on the new building and contents under Washington County Policy #37-654-0522. An additional $10,000.00 was added December 8, 1950 under Pennsylvania Millers Policy #396863. On February 3, 1951, $15,000.00 additional was added under Berkshire Policy #649973. This made a total amount of $40,000.00 and the bill was sent to you February 9 in the amount of $484.70. It was paid in full by your office March 1, 1951.

The policy written in the Washington County effective November 2 was reduced from $15,000.00 to $10,000.00 on March 2, 1951. This was because the company did not want to carry more than $10,000.00 after they made an inspection. This policy was then reduced to $10,000.00 and a policy was written in the Millers Mutual #B 46745 and was billed to you March 5, 1951, in the amount of $30.33. This was paid in full by your office May 9, 1951.

March 19, 1951 we were out to see Mr. Easton and he asked us to increase the insurance to $100,000.00 making $50,000.00 on the building and $50,000.00 on contents including the lumber in the open yards. We forwarded binders to your office subject to the Middle Department making rates on same. We had considerable difficulty with the Middle Department in getting them to rate your new building. When they finally did rate it, it was very high. We then fought with them for a long time in attempts to get the rates reduced, but were unsuccessful.

*We then discussed the matter with Mr. Easton on October 1 and he requested us to eliminate the coverage entirely on the new building and cover $60,000.00 on all stock outside of the building.*

or fraud should have been submitted to the jury and that, therefore, the defendants are entitled to judgments n.o.v.[7]

The judgments of the Court of Common Pleas of Washington County are reversed and here entered in favor of the several defendants.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

I differ with the majority, not on the law, but on its application to the facts in this case.

Plaintiffs brought six separate suits to recover on six fire insurance policies dated October 1, 1953, each of which covered "stock of lumber and builder's supplies in open yards and *sheds** at rear of the assured's warehouse and along railroad siding . . ." The suits involved exactly the same question and were tried to-

---

This bill was sent to you October 12, 1951, premium being $319.60. At the same time we sent you a credit for $175.67 which was the total return premium on the original bill of $484.70, paid by your office March 1, 1951.

The binder charges from March 19 to October 1 for the $60,-000.00 netted $322.01. There was never a bill sent to you on the binders until Oct. 15, 1951.

We hope we have made ourselves clear on the matter of these bills and if there is any further question, do not hesitate to call us.

Yours very truly, 

Mutual Insurance Agency

KMY, Jr.:dg" (Emphasis supplied)

[7] A court may not, on motion for judgment n.o.v., eliminate evidence improperly received at trial and then dispose of the case on the basis of the diminished record when there is an issue of fact to be determined. *Cherry v. Mitosky*, Admr., 353 Pa. 401, 404, 45 A. 2d 23 (1946). But when the issue has itself been withdrawn from the consideration of the fact finder, the rule does not obtain.

* Italics throughout, ours.

gether. The jury returned a verdict in favor of plaintiffs in the total sum of $39,517.11.

The policies dated October 1, 1953 were renewal policies—the original policies, which were identical, were dated October 1, 1951 and ran for a period of one year. The parties based their arguments and the Court has based its decision upon the intention of the parties as disclosed in the original policies. The most important question that arises is whether or not the policies covered the lumber and builder's supplies in the open sub-basement rooms or stalls of the warehouse; in other words, whether these open rooms or stalls in the sub-basement were "sheds" within the meaning of the insurance policies.

The insurance policies on their face appear clear and unambiguous. The word "sheds" ordinarily would not include rooms or stalls in the sub-basement of a warehouse. Nevertheless, plaintiffs introduced a wide variety of parol evidence in an attempt to prove that the word "sheds" was intended to include the aforesaid rooms or stalls. This oral evidence was introduced under two theories, (1) that a latent ambiguity existed in the policies, and (2) that the policies should be reformed *after* the fire to include the basement and the rooms or stalls in the sub-basement because of fraud, accident or mistake.

Parol evidence is admissible to explain, clarify, interpret and resolve a latent ambiguity,* i.e., an ambigu-

---

* When the language of a written instrument is equivocal or obscure or ambiguous, an ambiguity arises which is usually referred to as a latent ambiguity rather than a patent ambiguity, although the cases are not clear as to what is a latent and what is a patent ambiguity. In such a case, parol evidence is admissible to explain, clarify, interpret and resolve the ambiguity. Cf. *Logan v. Wiley*, 357 Pa., supra; *Beisgen Estate*, 387 Pa. 425, 431, 128 A. 2d 52;

ity which arises from extrinsic or collateral facts and circumstances which make the meaning uncertain even though the language of the instrument be clear and unambiguous: *Logan v. Wiley*, 357 Pa. 547, 55 A. 2d 366; *Gerety Estate*, 354 Pa. 14, 16, 46 A. 2d 250; *Metzger Estate*, 222 Pa. 276, 71 A. 96; *Lycoming Mutual Insurance Co. v. Sailer*, 67 Pa. 108; *Beatty v. Lycoming County Insurance Co.*, 52 Pa. 456; *Koplin v. Franklin Fire Insurance Co.*, 158 Pa. Superior Ct. 301, 44 A. 2d 877; 32 C.J.S. Evidence, §961 (b)(1); Henry, Pennsylvania Evidence, 4th Ed. Vol. 2, §599. See also *Barium Steel Corp. v. Wiley*, 379 Pa. 38, 44, 108 A. 2d 336; *Albert v. Schenley Auto Sales, Inc.*, 375 Pa. 512, 100 A. 2d 605; *Waldman v. Shoemaker*, 367 Pa. 587, 80 A. 2d 776; *Security Trust Co. of Pottstown v. Stapp*, 332 Pa. 9, 13, 1 A. 2d 236; *Kittanning Coal Co. v. Moore*, 362 Pa. 128, 66 A. 2d 273.

An insurance policy will be construed most strongly against the insurer who prepared it: *Blue Anchor Overall Co. v. Pennsylvania Lumberman's Mutual Ins. Co.,* 385 Pa. 394, 123 A. 2d 413; *Beley v. Pa. Mutual Life Ins. Co.*, 373 Pa. 231, 95 A. 2d 202; *MacDonald v. Metropolitan Life Ins. Co.*, 304 Pa. 213, 155 A. 491; *Howley v. Scranton Life Ins. Co.*, 357 Pa. 243, 53 A. 2d 613; *West v. McMillan*, 301 Pa. 344, 152 A. 104.

" ' "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles." [citing cases] "Contracts must receive a reasonable interpretation, according to the intention of the parties . . . if that intention can be ascertained from their language." ' Brown v. Raub, 357 Pa. 271, 287, 54 A. 2d 35.

---

*Morgan v. Phillips*, 385 Pa. 9, 14, 122 A. 2d 73, and numerous cases cited therein.

" ' ". . . in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement": Slonaker v. P. G. Publishing Co., 338 Pa. 292, 296, 13 A. 2d 48, 50, 51.' Hindman v. Farren, 353 Pa. 33, 35, 44 A. 2d 241.": *Betterman v. American Stores Co.*, 367 Pa. 193, 80 A. 2d 66.

With these principles in mind, we shall briefly review the evidence presented. In order to show that the word "sheds" was not used in or intended to have its ordinary meaning, plaintiffs proved that there was *only one shed* in the open yard namely, a fir gutter shed, at the time the first insurance policies were executed on October 1, *1951,* and *during the entire year when the policies were in effect.* From this fact, plaintiffs contend that the word "sheds" being in the plural, necessarily must have been intended to include the four separate open sub-basement rooms or stalls.

Plaintiffs, to further support their construction, proved that *at the time the fire insurance policies were issued in 1951* in the sum of $60,000, (a) the lumber stored at the railroad siding had a fair market value of $15,000, (b) the lumber and materials *in the gutter shed was of little value* and (c) the lumber stored in the open sub-basement rooms or stalls had a fair market value of $45,000—a total of $60,000. Although plaintiffs are suing on policies taken out in October 1953 when additional sheds had been erected in the open yards (commencing in March 1952), they contend that they would not have taken out $60,000 worth of fire insurance in 1951 to cover $15,000. worth of lumber at the railroad siding and in the fir gutter shed unless they and Young, who was the authorized agent of the insurance companies and who saw the premises, intended the insurance in those policies to cover the

lumber and building materials stored in the sub-basement open rooms or stalls in the warehouse.*

Whether the aforesaid parol evidence of extrinsic facts and circumstances was legally sufficient to create a latent ambiguity was, in the first instance, a matter of law for the Court. If the Court decided that the evidence was legally sufficient to create a latent ambiguity, then the question of what the parties intended by the language used in the contract—taking into consideration the extrinsic facts and circumstances—was a question to be determined by the jury. Cf. *Titusville Trust Co. v. Johnson*, 375 Pa. 493, 100 A. 2d 93; *Gerfin v. Colonial Smelting and Refining Co., Inc.*, 374 Pa. 66, 97 A. 2d 71; *Wagner v. Somerset County Memorial Park*, 372 Pa. 338, 93 A. 2d 440; *Waldman v. Shoemaker*, 367 Pa. 587, 80 A. 2d 776; *Corn v. Wilson*, 365 Pa. 355, 75 A. 2d 530; *Stafford v. Reed*, 363 Pa. 405, 70 A. 2d 345; *Brandolini v. Grand Lodge of Pa.*, 358 Pa. 303, 56 A. 2d 662; *Aliquippa National Bank v. Harvey*, 340 Pa. 223, 16 A. 2d 409. See also *University City, Mo. v. Home Fire and Marine Insurance Co.*, 114 F. 2d 288; *East and West Insurance Co. of New Haven, Conn. v. Fidel*, 49 F. 2d 35; *Queen Insurance Co. of America v. Meyer Milling Co.*, 43 F. 2d 885.

Considering the unusual extrinsic facts which are present in this case and all the surrounding circumstances, including the unusual open rooms or stalls in which the lumber was stored, I believe (1) that there was a latent ambiguity in these insurance policies, (2) that parol evidence was admissible to clarify, interpret

---

*The majority's assumption that plaintiffs took out $60,000 of fire insurance to cover $15,000 worth of lumber because of possible or contemplated increase of lumber in additional or future built sheds might be persuasive if additional sheds had been built by plaintiffs during the period (one year) covered by the insurance policies.

and resolve the ambiguity, and (3) that the construction of the insurance policies in the light of all the evidence and under proper instructions from the Court was a question of fact to be determined by the jury.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I agree with everything said by Justice BELL in his Dissenting Opinion and would add an additional observation or two in support of our conclusion that the verdict of the jury in this case should be approved and the judgment affirmed.

When the plaintiff, Samuel Easton, and the representative of the involved insurance companies, Everett Young, discussed the matter of insurance on Easton's lumber, Young quoted the insurance rate of $3.22 on the lumber stored inside Easton's warehouse and $.99 on the lumber in the yard. Easton indicated that if he could not be given the lower rate on the lumber stored in the basement and sub-basement of his building, he would not purchase insurance. At the time of this discussion Easton had lumber stacked in three places: a quantity valued at $45,000 in basement and sub-basement stalls in his building; another quantity at the railroad siding worth $15,000; and a small, as well as inferior grade, of lumber in a so-called gutter rack or shed by the creek worth not more than $300. Obviously, the most momentous of these items was the $45,000 stock in basement and sub-basement.

When Easton declined to pay the $3.22 rate on the $45,000 stock, Young offered him the outdoor rate provided he would isolate the lumber stalls in his building from the rest of the building so that he could classify their contents as "shed" lumber. Easton accepted this proposition and accordingly built an expensive and for-

midable floor-to-ceiling wall athwart the basement so that at this level the warehouse became in effect two structures. After the wall was built there was no way for one to move from the forward part of the building to the rear portion without passing around on the outside and entering by a door in the rear.

Easton testified: "Q. Well then you understood, from the words that you say he used, if you put that wall up, then your rate in this separated part of the building, as you put it, would come down from what was the rate on the building of $3.22, down to about 50 cents? A. It would come down to the same rate he had given me on *the open sheds* and yard in Thompsonville. Q. And you said that was fifty cents? A. Yes, with my dividends. . . . Q. The *word shed* then was going to mean a part of your building? A. *That's right,* the rear of it. Q. It would still be part of the building? A. *It was stalls and sheds,* correct—the rear of it.*

Young denied this conversation but the jury gave credence to Easton's testimony.

If the arrangement described by Easton did not take place, the following questions inevitably present themselves:

1. Why would Easton have erected the expensive wall which blocked off all communication between the forward and rear part of his building?

2. Why would he have taken out $60,000 worth of insurance on the lumber at the railroad siding and the lumber in the gutter rack, the total value of which was only $15,300?

3. If the stalls in the warehouse were not to be regarded as sheds, why would the insurance policies employ the plural word "sheds", when at the time only

---

* Italics throughout, mine.

*one* structure could classify as shed according to the interpretation given by the defendants?

4. What happens to the testimony, apparently believed by the jury, given by Robert Graham, who said: "There was a sub-cellar down underneath there. What we called the sheds,—*we called them sheds.*"

Speaking to the subject of sheds, the Majority Opinion says: "The mere fact that the plural 'sheds' was used in the present policies when only one such structure existed in 1951 does not create an ambiguity. . . . If a policy of insurance were drawn to cover 'horses' and the insured had but one horse at the time, certainly no such ambiguity would arise as would permit testimony that the policy was meant to cover the insured's cow as well."

I doubt that the horse-and-cow illustration is an apt one. Webster defines a horse as a "large, solid-hoofed, herbivorous mammal domesticated by man since a prehistoric period and used as a beast of burden or for riding." Webster defines a cow as "the mature female of wild or domestic cattle of the genus Bos (ruminant quadrupeds)." There are many differences between a horse and a cow which we should not use valuable paper to delineate, outline, enumerate and describe. Certainly there are not that many differences between a shed as described by the Majority and the basement stalls described by the plaintiffs' witnesses. Cows and horses have no similarity except that they are both quadrupeds, they have no common feature except that they are equally exploited by man, they have no social resemblance to each other except that they both feel at home in a stall or shed. There is, however, a vast area of similarity between the three-sided enclosures housing the lumber in Easton's warehouse and the gutter rack enclosure (called a shed) housing lumber in his yard.

The Majority Opinion insists that the insurance policies cannot possibly cover the stalls in the warehouse and that they were directed only to the lumber in the open. A high wall obstructs movement along this path of reasoning. When the policies were written, there was, as already mentioned, only one outside shed in existence. Why, then, it is necessary to ask again, did the policies speak of sheds? The Majority Opinion attempts to surmount and pass over this wall by explaining further: "The meaning of the policies is simply that the one existing shed was insured and, further, that any other sheds which might be erected during the life of the policy would also be covered to a total value of $60,000."

But who says that *that* is the "meaning of the policies"? The Majority Opinion writer. But how does he know that that is what the contracting parties had in mind? How can he derive that meaning except from extraneous evidence? And if he can reason "shed" from the specific word "sheds," then he must consider the circumstances surrounding the writing of the policies.

And if the Majority admits that surrounding circumstances must be analyzed and evaluated, then the door has been opened for interpretation of the contract and parole evidence must be considered in arriving at the intention of the parties.

Taking up again the topic of a plural subject matter, let me offer an illustration. If a man has one natural child and one stepchild and takes out insurance on two children, the obvious conclusion would be that he meant to insure the lives of both the natural child and the stepchild. It could not be argued by the insurance company that when the word "children" was used, it was intended to refer only to the natural child and such other natural children as might be procreated in

the future by the man and his wife. Under such a construction the insurance company could find itself in a serious actuarial predicament if the man and wife were healthy and prolific procreators and capable of bringing into being another dozen offspring. Similarly, would the defendant companies in the case at bar, as the Majority Opinion suggests, have insured blindly all sheds that Easton might have erected *after* the signing of the contract? Isn't it more likely, more reasonable and more in keeping with business regularity to assume that the insurance companies contracted to cover what was in existence *at the time of the signing of the contract?* And wouldn't that mean the shed in the yard and the stalls in the warehouse which were also referred to as sheds?

There is another question which is not answered by the Majority Opinion. If Easton intended to insure his lumber, and of course he did, why would he restrict the coverage to the least valuable part of his stock—that which lay exposed to the elements in the yard,—and ignore the treasure in the warehouse stalls? Again, unless we ascribe to Easton a subnormal intelligence which is not evidenced by anything in the record, why would he pay premiums on $60,000 worth of insurance to cover only $15,000 worth of lumber?

These circumstances and many others covered in the 450 printed pages of testimony give added substance to Brother Bell's conclusions that (1) there was a latent ambiguity in the policies, (2) parol evidence was admissible to clarify, interpret and resolve the ambiguity, and (3) the construction of the insurance policies in the light of all the evidence and under proper instruction from the Court was a question of fact to be determined by the jury.