## L. & W. Demolition Co., Inc. v. Rockwood Insurance Company

*David Lehman,* for plaintiff.
*David Eaton,* for defendant.

DOWLING, J., November 4, 1976 — The present case requires that we, once again, embark upon a semantical journey down the labyrinthine ways of insurance policy language.

Plaintiff, while demolishing a fire ruined building, damaged an adjoining premises when a portion of the wall of the burned building fell in the wrong direction (outward rather than inward). L. & W. was sued, found liable, and required to pay verdict, interest and attorney's fees totaling $30,673.

The demolition company carried liability insurance with defendant insurance company who, however, denied coverage for the occurrence in question and refused to defend the action; where-

upon, it was sued for breach of contract with the jury finding in favor of plaintiff in the amount of its previous loss, i.e., $30,673.

Defendant's numerous assignments of error (34) in support of its motion for judgment n.o.v. and for a new trial were distilled in his brief to 12 questions which we further compress into several basic issues.

The insurance policy in question provided general liability coverage, both for property damage and bodily injury claims. The coverage was furnished for the operations of L. & W. Demolition Company described as "wrecking buildings or structures." The contractor was required to notify the company prior to undertaking each particular job and the company had to accept coverage for the specific project. It notified the insurance company of the job in question and received a special endorsement covering this operation.

Rockwood undertook in its insuring agreement to furnish liability insurance for bodily injury and property damage claims as follows:

"The company will pay on behalf of the insured any sums which the insured shall become legally obligated to pay as damages because of

Coverage A Bodily Injury or
Coverage B Property Damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage even if any of the allegations of the suit are groundless, false or fraudulent, and make such investigation and settlement of any claim or suit as it deems

expedient, but the company shall not be obligated to pay any claim or judgment or defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

Rockwood invokes the language of the exclusions from coverage whch provides as follows:

"Exclusions — This insurance does not apply . . . (o)[sic] to property damage included within . . . (2) the collapse hazard in connection with operations identified in this policy by a classification code number which includes the symbol 'c'."

The policy defines "collapse hazard" as follows:

" 'collapse hazard' included 'structural property damage' as defined herein and property damage to any other property at any time resulting therefrom. 'Structural property damage' means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunnelling, pile driving, cofferdam work or caisson work or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) arising out of operations performed for the named insured by independent contractors, or (2) included within the completed operations hazard or the underground property damage hazard, or (3) for which liability is assumed by the insured under an incidental contract."

The underlying point at issue in this suit is the interpretation to be given to the insurance policy involved and more particularly to the collapse exclusion. It is plaintiff's position that the language is ambiguous and that it was for the

jury to construe whether or not coverage was afforded or excluded. Defendant's view is that the terms involved are by themselves clear and unambiguous, that the issue should not have been presented to the jury or, in the alternative, that the jury erred in finding that coverage was afforded.

In analyzing the contractual terms, there are certain basic legal principles which must accompany us. While plaintiff always has the initial burden of proof, this was not really involved in the instant case because there is no dispute that the policy was in full force and effect. The insurance company's defense is based on an exclusion in the policy and, therefore, it has the burden of proving its position by a preponderance of the evidence "[a] defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it." Armon v. Aetna Casualty & Surety Company, 369 Pa. 465, 469, 87 A. 2d 302 (1952). There is also the well-established rule that if an insurance policy is reasonably susceptible of two interpretations, it is to be construed in favor of the insured in order not to defeat without plain necessity the claim to indemnity which it was the insured's object to obtain: Frick v. United Firemen's Ins. Co., 218 Pa. 409, 67 Atl. 743 (1907). In addition, any ambiguity in the insurance contract must be resolved in favor of the insured, since it was the insurer who wrote the policy: Sykes v. Nationwide Mut. Ins. Co., 413 Pa. 640, 198 A. 2d 844 (1964).

Does the wording of the exclusion present a clear and unambiguous statement of noncover-

age. We think not. The insuring agreements of the policy give the insured property damage liability coverage for activities arising out of, or relating to, his business, i.e., demolition or wrecking, and he paid a substantial premium for this protection, over $2,700 in 1972 alone. The collapse exclusion if read literally *could* be taken to eliminate any property damage coverage whatsoever from or due to "demolition of any building or structure for rebuilding of any structural support therefrom . . ." Under any interpretation, it is certainly a major diminution of property damage coverage, otherwise furnished in the insuring agreement. The term "structural property damage" is defined as meaning "the collapse of . . . any building . . . due to . . . demolition." Whatever is structural property damage is excluded as within the collapse hazard, as well as damage to any other property resulting therefrom. It is clear from an examination of the declarations portion of the policy that defendant insured the business risks incident to the business of plaintiff demolition company and described those risks as "wrecking buildings." It is just as clear that the business of wrecking buildings is accompanied by bringing about their controlled collapse.

Yet it seems apparent from the premium charged that the property damage liability coverage created a substantial risk, notwithstanding the collapse exclusion. Of particular interest is the fact that the exclusion could have been eliminated for an additional premium of only $15. This seems to elicit the inference that the carrier attached little risk to the additional exposure arising from collapsed coverage.

The evidence of an ambiguity was further established by expert testimony which evidence defendant objected to and whose admission is one of its principal assignments of error. One Fred Heiteffus, an independent insurance agent representing many carriers, including, at one time, defendant company, and a qualified CPCU* testified:

"Q. Based upon your opinion, your experience in the insurance industry, does the collapse hazard exclusion language, the type that's in the policy, Exhibit 1, as it applies to the property damage liability coverage of a demolition contractor, does that exclusion have a clearly understood, well accepted meaning?

"A. I would say no. If there is any clear understanding it is a super gray area. You just try to avoid it by not having it in a situation that it applies, try to buy it out.

"Q. In your opinion, based upon your knowledge, your investigation of this incident, your knowledge of the insurance policy, Exhibit No. 1, was there coverage for the Carlisle accident claim furnished under that policy with the collapse exclusion applying to it?

". . .

"A. In my opinion there is coverage for what happened with the collapse exclusion applying and I so stated on a statement I signed for the company prior to them issuing this letter.

"THE COURT: In other words, you are saying as the policy was written there was coverage in your opinion?

---

* This is a professional designation held by less than ten percent of the insurance agents requiring many hours of study; a successful completion of various examinations, and a minimum of three years experience in the business.

"THE WITNESS: Yes.

"THE COURT: So that in your opinion the exclusion is not applicable to this loss?

"THE WITNESS: Yes, that's correct."

Defendant contends that this testimony was irrelevant because the policy was not unambiguous. This is logically comforting only if we overlook the fact that the major premise assumes the point in issue; a syllogism not infrequently met with in many arguments.

Defendant also objects to the expert stating that the exclusion was not applicable on the principle that this was the ultimate issue in the case and thus the witness was invading the province of the jury. Ignoring the inconsistency in the insurance company's position, since it is basically asserting that the issue should have been for the court, it has long been held in Pennsylvania that expert testimony may be received whenever the circumstances cannot be fully understood without special knowledge and training.

"The proper office of the expert is to instruct the court and jury in matters so far removed from the ordinary pursuits of life that accurate knowledge can be acquired only by special study or experience. The ground of admissibility is necessity, and when that ceases, opinions are not competent evidence . . . But if a case is a proper one for receiving opinions of experts, such evidence is competent though it relates to the ultimate issue to be decided by the jury." 1 Henry, Pa. Evid. 4th Ed. §560.

Opinions of experts on the ultimate issue to be decided by the jury are received constantly in this Commonwealth: Cooper v. Metropolitan L. Ins. Co., 323 Pa. 295, 186 Atl. 125 (1936). For example, in many eminent domain cases, the only issue is

the amount of compensation payable for land taken and almost always the proof is by opinion evidence, and where the ultimate issue is sanity or insanity, opinion evidence is frequently all there is. It must also be noted that defendant, although it had its chief underwriter on the witness stand, specifically disqualified him as an expert witness and declined to present any testimony on the subject raised by plaintiff's evidence, i.e., the meaning and scope of the collapse exclusion.

The insurance company contends that the court should have construed the language of the collapse exclusion as a matter of law. But even if the contract language were capable of a single consistent interpretation, which we do not believe it was, such interpretation cannot be drawn in a vacuum. In analyzing the problem, one must consider the business operations of plaintiff and the fact situation of the particular accident.

"A latent ambiguity arises from extraneous or collateral facts which make the meanings of a written instrument uncertain although the language thereof be clear and unambiguous. Metzger's Estate, 222 Pa. 276, 71 Atl. 96 (1908) . . .

"Whether evidence of extrinsic circumstances is sufficient to create a latent ambiguity in a contract is a matter of law for the court. Only after the court is satisfied that a latent ambiguity exists is the question of what the parties intended by language used in the contract — taking into consideration the extrinsic facts and circumstances — an issue to be submitted to the jury. Waldman v. Shoemaker, 367 Pa. 587, 592, 80 A. 2d 776 (1951); Lycoming Mutual Insurance Co. v. Sailer, 67 Pa. 108, 113 (1870). See also Williston op. cit. supra,

§616." Easton v. Washington County Ins. Co., 391 Pa. 28, 35-6, 137 A. 2d 332 (1957).

Since the amount involved was not at issue, the court submitted to the jury two interrogatories:

1.  By its wording, does the collapse hazard exclusion preclude coverage for the Carlisle accident? Yes —— No ——.

2.  If it does, was the insured (L. & W. Demolition Company) aware of the exclusion and were its effects explained to him (it) Yes —— No ——.

The jury was instructed that if they answered the first question in the affirmative, which they did, they need not concern themselves with the second question.

Certain of defendant's assignments of errors arise to evidence concerning admission of testimony relative to plaintiff's awareness of the exclusion. See Hionis v. Northern Mutual Ins. Co., 230 Pa. Superior Ct. 511, 327 A. 2d 363 (1974), where the court stated that the burden of establishing the applicability of an exclusion or limitation involves proof that the insured was aware of the exclusion or limitation and that its effects were explained to him. We feel that the jury's affirmative answer to the first interrogatory renders moot any discussion on this point.

If insurance companies persist in using esoteric language in their contracts, they must accept jurors resolvement of their verbal symbols.

Accordingly, we make the following

### ORDER

And now, November 4, 1976, defendant's motions for judgment n.o.v. and for a new trial are denied.