Richard E. MELLISH, II and Cleve Calhoun, Appellants

v.

HURLOCK NECK DUCK CLUB, INC.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2005.

Decided Oct. 28, 2005.

Reargument Denied Dec. 22, 2005.

---

Wendy R.S. O'Connor, Allentown, for appellant, Richard E. Mellish, II.

Scott B. Allinson, Allentown, for appellant, Cleve Calhoun.

Jeffrey R. Dimmich, Orefield, for appellee.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Richard Mellish, II and Cleve Calhoun appeal an order of the Court of Common Pleas of Lehigh County (trial court) dismissing their petition to clarify or, in the alternative, to vacate a settlement agreement. The agreement sought to settle litigation instituted by Mellish and Calhoun against the Hurlock Neck Duck Club, Inc. to enjoin implementation of Club by-laws that they believed had been improperly adopted and, therefore, unenforceable. Concluding that there was not a meeting of the minds on the terms of the settlement, we reverse.

Hurlock is an eight-member duck hunting club that owns land on Maryland's Eastern Shore that is surrounded by a separate 7,000 acre parcel of land.[1] The Club was organized in 1963 as a Pennsylvania non-profit, member corporation. Six of Hurlock's eight members have belonged to the Club for decades, some since 1963.[2] The last two persons to join the Club were Richard Mellish, II[3] and Cleve Calhoun, who did so in November 1989 and November 2001, respectively. The initiation fee for Club membership is $6,000. This fee entitles the member to share in the activities of the Club; it also gives each member an equal share in the Club's property.[4]

---

1. The record does not indicate the size of the Club's parcel of land; Club members enjoy the use of the surrounding 7,000 acres by reason of the Club's easement to use the 7,000 acres.

2. As of early 2003, Hurlock's eight members were Samuel Saxton, Jack Barnhart, Richard Hansen, Morton Zifferer, Mike Thornton, Richard Mellish, Sr., Richard Mellish, II, and Cleve Calhoun. Samuel Saxton has been president of the Club since it was founded.

3. "Mellish," as used in this opinion, refers to Richard Mellish, II not Richard Mellish, Sr.

4. Jack Barnhart, a Club member and vice-president for over thirty years, testified regarding membership as follows:

Q: If the property was sold tomorrow do you believe that each member would receive a fraction of the proceeds to do as they pleased with it?
A: I imagine.
Q: Okay.
A: That's only my opinion.
Q: Have you had discussions with the other members about receiving the proceeds of the sale of the property?
A: No. I guess everyone just assumes that it would be—the members would divide the proceeds.

* * *

Q: If the property were sold tomorrow what fraction of the proceeds would you receive?
A: One-seventh.
Q: And if Mr. Calhoun was still a member and the property was sold, what fraction of the proceeds would you receive?
A: One-eighth.
Q: And he would receive one-eighth?
A: That's correct.

According to the record, five of the eight members want to sell the Club's property in Maryland and split the proceeds of the sale among the members, effectively ending the Club.[5] However, a vote of six is required for the sale to proceed.

On March 5, 2003, Samuel Saxton, president, sent a written notice to all Club members announcing a special meeting on March 20, 2003, to "update the Club's by-laws into conformity with existing procedures of the Club and in areas of articles dealing with membership, meetings, and duties and powers of officers." Reproduced Record at 6a–7a (R.R. ——). The written notice did not include a copy of the proposed amendment to Hurlock's bylaws. Four members of the Club attended the meeting,[6] and one member, Zifferer, sent his oral proxy in favor of amending the bylaws.

At the special meeting, those in attendance considered new bylaws designed to institute critical changes to the operation of the Club. First, the vote to remove a member for cause, defined in the bylaws as "conduct prejudicial to the corporation,"

would no longer require a unanimous vote but a simple majority vote. Second, a vote of the majority would determine what conduct was "prejudicial to the corporation." Third, a member subject to removal would no longer be given written notice of, or an opportunity to defend against, accusations of prejudicial conduct.

At the special meeting, Article III, Section 10 of the bylaws was amended[7] to read as follows:

> Any member may be removed from membership by the majority vote of the remaining members at any annual or special meeting of the members, for conduct which a majority of the members deem prejudicial to the club. Upon removal of a member his membership shall be paid off within the same time limits as heretofore indicated.

Amendment to Article III, Section 10; R.R. 23a. Following the vote to amend Article III, Section 10, the members discussed the conduct of member Cleve Calhoun and determined that it had been prejudicial to Hurlock.[8] The four mem-

---

Deposition of Jacob A. Barnhart, October 10, 2003, at 87–88 (Barnhart Deposition ——).

5. Barnhart testified as follows:
 Q: Then why did the other members want to sell the club, as you understand it, then?
 A: I think each individual member had his own reason. One guy is 88 years old and physically can't handle it. The other guy doesn't hunt. And—and each—each member had their only [sic] reason.
 Barnhart Deposition 100.

6. The four members in attendance were Samuel Saxton, Jack Barnhart, Richard Hansen, and Mike Thornton. These four members and member Zifferer are in favor of selling the Club's property.

7. Prior to the meeting Article III, Section 10 read as follows:
 Any member may be removed from membership by the *unanimous vote of the re-*

*maining members* at any annual meeting of the members or at any special meeting of the members, for conduct deemed prejudicial to the corporation, *provided that such member shall have first been served with written notice of the accusations against him, and he shall have been given an opportunity to produce his witnesses, if any, and to be heard, at the meeting at which such vote is taken.* Such membership shall be paid off within the same time limits as heretofore indicated (within two years).
 Hurlock Bylaws, Article III, Section 10 (emphasis added); R.R. 23a.

8. The meeting minutes provide no indication as to what conduct was prejudicial; rather, the minutes simply state that "Calhoun's behavior was harmful and detrimental to the well being of the Club and its membership." Meeting Minutes, March 20, 2003, at 3; R.R. 66a. However, Jack Barnhart indicated that Calhoun's conduct, namely running for Club

bers in attendance voted to remove Calhoun from the Club's membership and to return Calhoun's $6,000 initiation fee to him as soon as possible, thereby divesting him of any interest in the Club's property. Meeting Minutes, March 20, 2003, at 3; R.R. 66a. Calhoun did not receive written notice of the accusations against him nor notice of the possibility that he might be removed from membership prior to the special meeting.

On June 19, 2003, Mellish and Calhoun filed a complaint and petition for a preliminary injunction, challenging, *inter alia,* the March 20, 2003, amendments to the Club's bylaws and Calhoun's removal from the Club. A hearing was scheduled for October 22, 2003, which was attended by six Club members. Immediately prior to the hearing, the parties convened to discuss a resolution of their dispute. The negotiations resulted in a settlement agreement, set out in eleven points, that was read into the record by Appellants' counsel, Scott B. Allinson. The agreement, *inter alia,* returned Calhoun to membership; nullified the alleged bylaw changes of March 20, 2003; required advance written notice of bylaw changes; required written proxies; and required Saxton to pay for the Club's legal fees.

At issue in this appeal is one of the eleven points in the settlement agreement. That point was read into the record as follows:

> Next number [9], *all votes for* officers and certain other *matters not addressed in the bylaws,* must be by a majority of the votes present, plus proxies validly recorded with the secretary. Any vote

president, was prejudicial because he became involved in the politics of the Club. Barnhart Deposition 13–16. Additionally, Barnhart testified that Calhoun and Mellish were responsible for trying to take over (in other words, control or run) the Club. Barnhart

to sell the real estate owned by the club must carry with no less than six votes in favor of sale.

Transcript of October 22, 2003, Hearing at 4 (emphasis added) (10/22/03 Settlement Transcript at ——). After listening to Allinson's presentation, the Club's counsel, Robert A. Weinert, spoke:

> One other point, Your Honor. In Mr. Allinson's presentation he stated that the votes would always be a majority with respect to the election of officers and such other—and other things, I believe he said.
>
> The agreement is that the existing bylaws will remain in full force and effect without the ones adopted at the March 20th meeting, with the one exception; and that is, that there be no unanimous votes.
>
> In other words, under the existing bylaws, there is a blackball provision. *He will agree* to remove all unanimous votes with respect to members, memberships; and in addition, *there is a dispute and that is the major dispute before the Court today, as to what is the interpretation of the word members, and* I believe Mr. Allinson has just stated that it would be a majority of the members present, including proxies.
>
> So therefore, as I understand the settlement agreement, there could be no requirement anywhere that would require a majority of all of the members, present and not.

**Mr. Allinson:** That clarifies it.

**Mr. Mellish:** Excuse me? State that again.

Deposition 23–24. In support thereof, Barnhart stated, "Well, we never had a problem with [Mellish] until Cleve Calhoun was taken in. And right away he—he said, we're going to get rid of you old farts. He meant Sam [Saxton] and I." Barnhart Deposition 24.

* * *

**Mr. Weinert:** So what our understanding is, and I think Mr. Allinson and I agreed with this, that will not come up again, because now *we are going to agree that it means a majority of the members present at the meeting, and not a majority of all the members.*

**The Court:** Members present and voting.

**Mr. Allinson:** Members present voting, plus valid proxies.

10/22/03 Settlement Transcript at 6–8 (emphasis added).

At the conclusion of the discussion on the settlement terms, Mellish, Calhoun and Saxton were polled by the trial court as to whether they understood and agreed to the settlement. Each replied, "yes." *Id.* at 14. The trial court thereupon explained that the entire colloquy would be reduced to a transcript as an enforceable order and then adopted by the court. The transcript was ordered filed on October 27, 2003.

In advance of the Club's annual meeting on January 4, 2004, Saxton circulated amended bylaws that would allow the removal, or addition, of a member, by a majority vote. Mellish and Calhoun objected to the amendment as outside the settlement agreement, which, they asserted, had nothing to do with the removal, or addition, of a member.[9] On April 5, 2004, Mellish and Calhoun filed a Petition to Clarify Ambiguities Contained in the Settlement Transcript or, in the Alternative, to Determine that No Settlement was Reached by the Parties.

On July 14, 2004, the trial court conducted a hearing on the petition to clarify. Both parties presented testimony on the question of whether the settlement agree-

ment was intended to delete the provision from the bylaws requiring a unanimous vote for the removal of a member.

Allinson testified on behalf of Mellish and Calhoun. He stated that there had been no discussion about changing the bylaw on membership during the settlement negotiations. Rather, the discussion concerned the meaning of a majority vote. The agreement Allinson read into the record recited that "votes ... [on] *matters not addressed in the bylaws,* must be by a majority of the votes present." 10/22/03 Settlement Transcript at 4. Because the matter of removing members was addressed in the bylaws, it was not covered by the settlement. Further, Allinson explained his declaration, "that clarifies it," made at the October 22, 2003, hearing in response to Weinert's discourse as follows:

> When I said that clarifies it, that meant *we were struggling* before the Court *with the members having to be either present or by valid proxy,* and that's what I was reacting to. There—that there was never any point during our negotiations or in the settlement that I read into the record, points one through eleven, where there was any indication that a provision of the bylaws dealing with membership was going to be amended.

Petition Hearing, July 14, 2004, at 20–21 (7/14/04 Petition Transcript at ——) (emphasis added).

Mellish also testified. He confirmed that removing the unanimous voting provision from the bylaws was never mentioned prior to Weinert's raising the topic at the October 22, 2003, settlement hearing. Mellish asserted that he would never agree

---

**9.** The record does not reflect what, if any, actions were taken by the members at the January 4, 2004, annual meeting.

to change the vote required on membership, stating as follows:

> If we had agreed to it, the majority of the members ... would very quickly take the people that did not want to sell the property, one by one, out for their own monetary gain.

7/14/04 Petition Transcript at 44.

Saxton testified for the Club. Saxton testified, first, that he understood the settlement to mean that the unanimous vote required on membership removal did not mean all the members of the Club but, rather, all the members at the meeting in person or by proxy. He then changed his "impression" to specify that a majority vote was all that would be needed to remove a member. The attorney then asked:

> Q. Now, Mr. Saxton, you just testified that it was the majority. Previously you testified it was unanimous. What were your settlement desires?
>
> A. The settlement, as I understand it, was that a majority of those present and voting at the meeting, including proxies, would be the controlling factor when we took members in or out.

7/14/04 Petition Transcript at 53. Cross-examination of Saxton led to the following exchange:

> Q. Did you ever discuss the removal of the unanimous voting provisions from the bylaws?
>
> A. We never felt we had to. We felt that it was always interpreted the way that it is now, in this provision. There is only—was only a clarification.

7/14/04 Petition Transcript at 54.[10]

The trial court dismissed the petition. The trial court agreed with the Club's interpretation of the settlement agreement, concluding that it provided that a majority vote of the members attending a meeting, not a unanimous vote, was all that was needed to remove a member from the Club.

On appeal,[11] Mellish and Calhoun present four issues for our consideration. First, they argue that the trial court erred in construing the settlement to cover not just the meaning of majority vote but also the procedure for removing members from the Club. Second, they contend that the transcript is ambiguous on whether the bylaw provision on removal of members was intended to be part of the settlement. Third, they assert that the trial court erred by refusing to consider extrinsic evidence presented at the hearing to resolve the ambiguities in the settlement. Fourth, Mellish and Calhoun contend that the trial court erred in its application of 15 Pa.C.S. § 5504(d)[12] in dismissing their petition.

---

10. Weinert suggests that the unanimous voting provision was not enforced, *i.e.*, that a majority is all that was needed to remove a member. This is inconsistent with the attempt to revise this bylaw provision. Further, he cited no previous history to support his interpretation. Finally, his belief is at odds with the actual words in Article III, Section 10 of the Club bylaws.

11. This Court's scope of review in an equity matter is limited to determining whether the trial court committed an error of law or abused its discretion. *Penn Township v.*

*Watts,* 152 Pa.Cmwlth. 359, 618 A.2d 1244, 1247 (1992).

12. 15 Pa.C.S. § 5504(d) states as follows:

> **(d) Amendment of voting provisions.**—Unless otherwise restricted in a bylaw adopted by the members, whenever the bylaws require for the taking of any action by the members or a class of members a specific number or percentage of votes, the provision of the bylaws setting forth that requirement shall not be amended or repealed by any lesser number or percentage of votes of the members or of the class of members.

It is well established that "[t]he enforceability of settlement agreements is determined according to principles of contract law." *McDonnell v. Ford Motor Company*, 434 Pa.Super. 439, 643 A.2d 1102, 1105 (1994). Courts will enforce a settlement if all the material terms of the bargain are agreed upon, and

> [i]f the parties agree upon essential terms and intend them to be binding, "a contract is formed ...". The intent of the parties is a question of fact which must be determined by the factfinder. A reviewing court must defer to the findings of the trier of the facts if they are supported by the evidence.

*Id.* at 1105–1106 (quoting *Johnston v. Johnston*, 346 Pa.Super. 427, 499 A.2d 1074, 1076 (1985)). Where a decree in equity is entered by the consent of the parties, it is binding upon the parties until they choose to amend it. *Cecil Township v. Klements*, 821 A.2d 670, 674 (Pa. Cmwlth.2003). While a court may interpret a consent decree as it would a contract, the court has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake. *Id.*[13] With these principles in mind, we consider whether the transcript of the October 22, 2003, hearing established that the parties agreed to the material terms essential to resolve the litigation.

The eleven points of the settlement read into the transcript by Allinson at the October 22, 2003, hearing were straightforward; however, the colloquy that followed muddled its terms. Weinert responded to Allinson's recital of the settlement terms with a wandering discourse that touched on the unanimous voting provision, noting that "[h]e *will* agree to remove all unanimous votes," but ended with the statement that "majority" meant majority of "members present." 10/22/03 Settlement Transcript at 6–7. Allinson reacted to Weinert's final statement "that clarifies it." *Id.* at 7. Pronouns are overused in this exchange, leaving in doubt the identity of their antecedent nouns. It is not clear to whom Weinert refers when he says "he" will agree, let alone how or when "he" will be agreeing to eliminate the unanimous vote. Allinson's "that" and "it" are similarly vague. He may be responding to Weinert's final sentence that begins "So, therefore," but it cannot be determined from the transcript of the October 22, 2003, proceeding.

The hearing of July 14, 2004, confirms the lack of any agreement. The Club's witness, Saxton, offered two different versions of the scope of the settlement. However, the witnesses in favor of and in opposition to the petition did agree on one point: prior to presenting their eleven-point agreement to the trial court, there had been no discussion on the bylaw provision requiring a unanimous vote to remove a member.

However, the October 22, 2003, transcript is sufficient, in itself, to establish that the parties failed to effect an agreement. Viewed in its entirety, the transcript reveals the hazards of an oral agreement, even a transcribed one. The settlement appears to have started out as an attempt to clarify that a "majority of

---

15 Pa.C.S. § 5504(d). This provision means that a unanimous vote is needed to amend the Club's bylaw requiring a unanimous vote for removal of a member.

**13.** This Court has stated, "unreasonable or not, unless the consent decree was the result of fraud, accident or mistake, it must stand even if it *now* appears that it is unfair or unreasonable." *Dravosburg Housing Association v. Borough of Dravosburg*, 71 Pa.Cmwlth. 144, 454 A.2d 1158, 1162 (1983) (emphasis original).

members" meant "majority of members present." By the end of the transcript, much other ground was covered. Because what the parties heard and what they understood were different, they failed to achieve a settlement.

 First, the terms of the October 22, 2003, settlement are ambiguous. A contract will be found to be ambiguous if, and only if, it is reasonable or fairly susceptible to different constructions, is capable of being understood in more senses than one, is obscure in meaning through indefiniteness of expression, or has a double meaning. *Erie Insurance Company/Erie Insurance Exchange v. Flood,* 168 Pa. Cmwlth. 258, 649 A.2d 736, 738 (1994). As noted above, the October 23, 2003, transcript suffers from indefiniteness of expression as well as obscurity, the earmarks of ambiguity.

 Second, the settlement was the result of mutual mistake, which is a basis for setting aside a settlement agreement. *McDonnell,* 643 A.2d at 1106. Mutual mistake will be found

> only where "both parties to a contract [are] mistaken as to existing facts *at the time of execution.*" ... [T]he moving party is required to show the existence of the mutual mistake by evidence that is clear, precise and convincing.

*Vonada v. Long,* 852 A.2d 331, 337 (Pa.Super.2004) (quoting *Smith v. Thomas Jefferson University Hospital,* 424 Pa.Super. 41, 621 A.2d 1030, 1032 (1993)) (emphasis added). "Clear, precise and convincing" evidence of mutual mistake will be found if the following factors are satisfied:

witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Easton v. Washington County Insurance Co.,* 391 Pa. 28, 37, 137 A.2d 332, 337 (1957) (quoting *Broida v. Travelers' Insurance Co.,* 316 Pa. 444, 447, 175 A. 492, 494 (1934)).

Here, there was a mutual mistake about whether the bylaw on member removal was being changed. Saxton thought that it was; indeed, it was so clear to him, that he did not think the topic needed to be discussed in the settlement negotiations. Mellish had the direct contrary explanation for why the unanimous voting provision was not discussed at the settlement negotiations, *i.e.,* he would never agree to it.[14] In sum, mutual mistake was established at the July 14, 2004, hearing by clear, precise and convincing evidence.

 The question, then, is whether to reform or to set aside the settlement agreement. Either remedy is appropriate in the case of a mutual mistake, and the relief granted depends on the nature and effect of that mistake. *Regscan, Inc. v. Con–Way Transportation Services, Inc.,* 875 A.2d 332, 340 (Pa.Super.2005).

The Restatement on Contracts provides some guidance on whether to reform or to rescind an agreement tarnished by mutual mistake. A mistake as to a basic assumption on which the parties entered into an agreement will make the contract voidable.

14. Mellish also stated that the first he heard of such a discussion was before the judge at the October 22nd hearing. 7/14/04 Petition Transcript at 39. Further, the term read into the transcript by Allinson was that "votes ... on matters *not* addressed in the bylaws" was to be by majority vote. The matter of membership removal was addressed in the bylaws, and it was by unanimous, not majority, vote.

RESTATEMENT OF THE LAW, SECOND, CONTRACTS AT § 152, COMMENT (b). Here, the parties had completely opposite views on the basic assumption to the settlement, namely which bylaw provision was to be amended. Saxton, for the Club, believed that the unanimous voting provision was being changed; Mellish and Calhoun believed that the definition of majority vote was being clarified. Given this wide divergence, the settlement is beyond a reformation. Because the parties failed to effect a valid and enforceable settlement agreement, it must be rescinded.

We reverse the trial court's dismissal of the petition to vacate the settlement agreement.[15]

### ORDER

AND NOW, this 28th day of October, 2005, the order of the Court of Common Pleas of Lehigh County dated December 31, 2004, in the above-captioned matter is reversed. The settlement agreement of October 22, 2003, is hereby vacated.

---

**15.** In light of our disposition, we need not address the other issues raised by Appellants.