## State Line & Sullivan R. R. Co., Appellant, *v.* Lehigh Valley R. R. Co.

*Railroads—Lease—Rental—Freight rates—Illegal contract—Interpretation by parties—Interstate commerce—Carriers—Rebates—Pleadings.*

1. Where a contract is clear and free from ambiguity, the intention, shown upon its face, must be followed, though contrary to the practical interpretation of the parties, even if such practical construction has been acquiesced in for a long time.

2. The rule that where a contract is susceptible of two constructions, one legal, and the other not, that construction should be followed which makes for legality, will not be applied, if the contract is undoubtedly illegal.

3. In an agreement dealing with interstate railroad rates the law assumes the parties had in mind and the contract impliedly contemplated the possibility that Congress might at some future time exercise its right of control over the subject-matter.

4. No device to defeat the enactment of Congress relative to discriminating freight rates can be upheld.

5. Even if a contract relating to rates was legal when made, Congress can by subsequent enactments make it illegal.

6. Where a railroad lease executed prior to the Interstate Commerce Act provided for the payment by the lessee of a stated sum per year as rent, and also provided at what rates coal from mines owned by the lessor should be transported over the leased road, and that, if the coal shipped exceeded a tonnage of 100,000 per year, the lessor should receive back five cents per ton for each ton transported, the courts will hold that the five cents was a rebate from a freight rate and not rental, and illegal under the act of Congress, if the rates provided were less than the published tariffs.

7. In such case the failure to pay the five cents allowance was not a breach of covenant for which damages could be recovered.

8. Even if it was such a breach, no recovery could be had, as the pleadings showed that plaintiff based its cause of action upon the agreement to pay rent, and not upon breach of covenant.

Argued March 6, 1923. Appeal, No. 243, Jan. T., 1923, by plaintiff, from judgment of C. P. Northampton Co., April T., 1922, No. 89, for defendant on case tried by the court without a jury, in suit of State Line & Sullivan Railroad Co. v. Lehigh Valley R. R. Co. Before MOSCH-ZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Assumpsit for rental. Before STEWART, P. J., without a jury.

The opinion of the Supreme Court states the facts.

Judgment for defendant. Plaintiff appealed.

*Error assigned,* inter alia, was judgment, quoting record.

*Richard W. Hale,* with him *Joseph N. Welch, Seth T. McCormick* and *T. McKeen Chidsey,* for appellant.—The parties to the lease in 1884 intended a rental covenant;

one which should give the lessor as such more rental whenever the railroad carried more coal: Towne v. Eisner, 245 U. S. 418.

The covenants as written in 1884 cannot be construed consistently and as a whole so as to make part of them call for freight rebates.

Contracts susceptible of two constructions, one of which is legal and the other illegal, must be construed to be legal: Zenatello v. Hammerstein, 231 Pa. 56; Hobbs v. McLean, 117 U. S. 567.

Such obedience of the parties to one construction and such admissions by long-continued action are binding upon the parties, and so upon the courts: People's Nat. Gas Co. v. Wire Co., 155 Pa. 22; Gass's App., 73 Pa. 39; Kane v. Ins. Co., 199 Pa. 205; Wright v. Gas Co., 2 Pa. Superior Ct. 219; Sherman v. Mfg. Co., 202 Pa. 446.

*E. J. Fox,* with him *J. W. Fox,* for appellee.—The plain intention of Congress in the Interstate Rate Legislation was to close every avenue against discrimination: Louisville & Nashville R. R. v. Mottley, 219 U. S. 467; New York, New Haven & Hartford R. R. v. Interstate Commerce, 200 U. S. 361; United States v. Transit Co., 226 U. S. 286; Chicago & Alton R. R. v. Kirby, 225 U. S. 155.

If the contract provides for a rebate, it cannot be enforced: Pittsburgh & Lake Erie R. R. v. R. R., 264 Pa. 162.

As there is no ambiguity in the contract itself, it is not necessary to resort to the expedient of considering the conduct of the parties or their interpretation of the contract: Phila., W. & B. R. R. v. Trimble, 77 U. S. 367; Kane v. Ins. Co., 199 Pa. 205; Sternbergh v. Brock, 225 Pa. 279; Bittner v. Coal Co., 271 Pa. 579.

OPINION BY MR. JUSTICE SCHAFFER, April 16, 1923:

In this suit, tried before the learned president judge of the court below without a jury, plaintiff seeks to re-

cover the sum of $137,056.22, with interest, representing an allowance of five cents per ton on coal shipped over its railroad, which it alleges to be rental due to it, by defendant, on a demise of the railroad to the latter. The answer of defendant is, that the sums of money claimed are rebates, and not rent, and hence they cannot be recovered. This view was adopted by the trial judge and approved by the court in banc; plaintiff, complaining of this conclusion, brings the matter before us for review.

Appellant's counsel thus state the dispute: "It is contended on behalf of the defendant, and the court has found, that these [certain provisions of the lease] are covenants for freight rates. If so, they were made illegal in 1887, by the Interstate Commerce Act of that year. It is contended in behalf of the plaintiff that when this lease was made in 1884 the parties (who did not foresee the Interstate Commerce Act or the different way of exercising matters which had arisen from it) intended and called for a sliding-scale rental."

To decide the controversy requires a construction of certain provisions of the lease to determine whether the payments in question are rent or rebates. It is dated April 14, 1884, between the plaintiff, as lessor, and a predecessor of defendant, as lessee, and is for the term of fifty years. It recites that the railroads belonging to the parties are connected with each other by means of an intervening railroad and that the lessor is the owner of certain coal mines, located on the line of its railroad, and that these are not demised; and provides, "First: That the said lessee shall and will pay to the said lessor, *as rent* for the premises hereby demised, the sum of thirty-six thousand dollars ($36,000) per annum during the first three (3) years of the term, and the sum of forty thousand dollars ($40,000) per annum during the remaining forty-seven (47) years of the term. The rent shall be payable in equal monthly sums at the office of the said lessor in Philadelphia, and payment shall be made upon the fifteenth day of each month of the sum due for

rent upon the first day of that month," with a further provision that there could be deducted from the rental during the first year a sum for rebuilding bridges; then follow several covenants having no bearing on this controversy, after which it is set forth, "It is understood and agreed that, during the continuance of this agreement, the lessee shall and will transport from the mines and collieries situated at or near Bernice, to Towanda, the coal to be mined from lands now owned by the lessor, *at rates* as follows, according to the number of gross tons so transported: When the number of gross tons transported in any year shall be not less than seventy-five thousand (75,000) and not more than eighty-seven thousand four hundred and ninety-nine (87,499), the rate charged shall be forty (40) cents per gross ton; when the number of tons shall be not less than eighty-seven thousand five hundred (87,500) and not more than ninety-nine thousand nine hundred and ninety-nine (99,-999), the rate charged shall be thirty-seven and one-half (37½) cents per gross ton; when the number of gross tons transported shall be not less than one hundred thousand (100,000), the rate charged shall be thirty-five (35) cents per gross ton. The rates named shall apply to all coal to be mined from lands now owned by the lessor, transported over the said railroad, whether destined to points between the mines and Towanda, to Towanda, or to points north or south of Towanda. The lessor shall pay to the lessee, monthly, upon the fifteenth (15) day of each and every month, the money due for coal transported from the mines of the lessor. The payments shall be made in the usual way to the lessee.

"The lessor agrees to ship from Bernice, over the railroad demised, in each and every year, at least seventy-five thousand (75,000) gross tons, and if the yearly shipment should be less than seventy-five thousand (75,000) gross tons, but not less than fifty thousand (50,000) gross tons, then the lessor shall pay to the lessee the sum of forty (40) cents for each gross ton shipped, and the sum of

twenty (20) cents for each gross ton of the quantity which would be required to make the number seventy-five thousand (75,000). And if in any year the shipment should be less than fifty thousand (50,000) gross tons, then the lessor shall pay to the lessee the sum of forty (40) cents for each gross ton shipped, and the sum of twenty-six and two-thirds (26 2/3) cents for each gross ton of the quantity which would be required to make the number seventy-five thousand (75,000) tons; but the lessee may at its option refuse to accept the payment of the said twenty-six and two-thirds (26 2/3) cents per ton for the deficiency of shipments of coal as aforesaid, and in lieu of said acceptance may declare the termination of this agreement, and at the end of sixty (60) days after the notification in writing to the lessor this agreement shall cease and determine. But such determination of this agreement shall not relieve the lessee from liability to the lessor, its successor and assigns, for all arrears of *rent* (in such case to be apportioned to the time of such determination) due and unpaid at the time, and for all damages resulting from the breach or breaches of covenant by the lessee." In the tenth clause of the lease, it is provided "That there shall be no determination of this lease nor right of reëntry consequent thereon by reason of default in payment of rent or any payments covenanted as aforesaid to be made."

Appellant's position is, as set forth in its statement of claim, "the lessor was to receive, in addition to the fixed rental above set forth, when the number of tons transported over the railroad exceeded 100,000 gross tons, an additional rental of five cents per gross ton so transported." These payments were made by defendant to plaintiff until 1910. It appears that the practice pursued by the parties prior to 1910 was, that the plaintiff paid the 40-cent rate on all coal shipped, and, at the end of the year, if the tonnage exceeded 100,000, defendant paid back to plaintiff five cents per ton for each ton transported. In May, 1911, when a payment of rent was

due, defendant declined to pay anything in excess of the rental of $40,000 per year, setting up that the five cents per ton payment was a rebate.

In support of its contention that the freight rate provisions in the lease were intended to be and are a sliding scale rental based on tonnage, plaintiff argues that the parties themselves so regarded them, and acted on this assumption for several years, and, that this construction of the contract by the parties, is binding upon them and upon us. It might be sufficient answer to this to say, that the construction of the parties, or their nomination of what they did, could not change the actual to the supposed or the desired. They certainly could not by calling that which was illegal, or might become so, by a term which implied legality give to it the quality of lawfulness when it was in fact unlawful, and, in an agreement dealing with rates, such as the one before us, the law assumes the parties had in mind and the contract impliedly contemplated the possibility that Congress might at some future time exercise its right of control over the subject-matter: see cases infra. But it is not in all cases that the interpretation which the parties have given to a contract establishes the true construction; it is only when the meaning is uncertain or ambiguous that the parties' interpretation is followed. "If clear and free from ambiguity, the intention shown upon its face, ......must be followed, though contrary to the practical interpretation of the parties, and even if such practical construction has been acquiesced in for a long period of time": Sternbergh v. Brock, 225 Pa. 279; Bittner v. Quemahoning Coal Co., 271 Pa. 579. In our view, the provisions of the contract with which we are dealing are clear.

Plaintiff's argument that the presumption in favor of the legality of the contract should be favored, and that where it is susceptible of two constructions, one of which is legal, and the other not, that construction should be followed which makes for legality (Zenatello v. Ham-

merstein, 231 Pa. 56) must go down, if the contract is, undoubtedly illegal. While it may be that the contract when entered into in 1884 was lawful, nevertheless, if the practice which it brought about has been barred by the law since then, it must be declared unlawful.

In its final analysis, plaintiff's entire argument is based upon the theory that the five cents per ton to be paid by the lessee to the lessor was an additional rental. We cannot follow this even so far as to concede that this was the intent of the parties in the first instance, when they executed the lease. To our minds, the two things, rent and freight rates, are separate, independent subjects, just as separate and distinct as they would have been had they been provided for in two documents instead of one. It is provided that the lessee shall pay "as rent......the sum of $40,000 per annum," that this "rent shall be payable in equal monthly sums," that the determination of the agreement "shall not relieve the lessee from liability......for arrears of rent......to be apportioned to the time of such determination"; the paper also speaks of "default in payment of rent or of any payments covenanted as aforesaid to be made." When the shipment of coal comes to be spoken of, its carriage "at rates" is the thing in contemplation.

The unusual feature of the letting of the railroad is that the company owning the railroad also owned coal mines. They were not leased with the railroad. The provision as to freight rates applied to the coal they produced. The lease says, "the lessor does not demise...... any of its coal lands......The lessee shall and will transport......the coal to be mined from lands now owned by the lessor, at rates as follows," and provides that the lessor shall pay the freight rates therefor as fixed in the contract. Nowhere in the writing is the allowance of five cents per ton on the freight rate denominated additional rent. If it had been so regarded, certainly it would have been so termed in a document as carefully drawn as is this one.

Later, plaintiff leased the coal mines. In the lease, it is agreed "that the rebate of freight rate to the State Line & Sullivan Railroad Company in the lease of its railroad......shall accrue to the benefit of and be paid to said lessees." If the rates were lawful rates, which it is admitted they are not (it is agreed they are less than the rates in the published tariffs filed with the Interstate Commerce Commission and that the coal moved in interstate commerce), they could not be construed to be rental for the railroad, because, when the possession of the coal and the railroad was severed, the advantage on the rates, as rates and not as rent, went to the lessees of the mines. Whatever it may now contend, plaintiff, at that time, in 1902, regarded the allowance here in controversy as a rebate and not as rent. As the court below well says, "Having in mind the practice of the parties, it clearly appears that they were paying for and adjusting the coal transportation business......and were not paying rent at all. Whatever may be the rights of these parties with respect to the amount of coal which the lessor was to ship over the lessee's road, and the varying rates which were to be charged, and the condition under which the lease might be given up, nevertheless the plain line of demarcation between the rent above referred to and the freight rates is always preserved."

That no device to defeat the enactments of Congress relative to discriminatory rates can be upheld has been decided in many cases, of which Armour Packing Co. v. United States, 209 U. S. 56; United States v. Union Stock Yard & Transit Co. of Chicago, 226 U. S. 286; Fourche River Lumber Co. v. Bryant Lumber Co., 230 U. S. 316; Baer Bros. Mercantile Co. v. Denver & R. G. R. R. Co., 233 U. S. 479; and Chicago, I. & L. Ry. Co. v. United States, 219 U. S. 486, are examples. We understand it not to be controverted that even if the contract before us was lawful when made, Congress could by subsequent enactments make it illegal. This is the doctrine laid down in Louisville & Nashville R. R. Co. v. Mottley,

219 U. S. 467, and in our own cases of Leiper v. B. & P. R. R. Co., 262 Pa. 328; Pittsburgh & Lake Erie R. R. Co. v. South Shore R. R. Co., 264 Pa. 162; City of Scranton v. Public Service Commission, 268 Pa. 192; and Suburban Water Co. v. Oakmont Borough, 268 Pa. 243.

Finally, plaintiff contends that by defendant's failure to pay the allowance, there was a breach of covenant by it for which damages can be recovered and it relies upon Rooks v. Seaton, 1 Phila. 106, as sustaining this position. There the lessor leased premises to another, who covenanted to erect a frame building, which a subsequent law forbade, and the lessor was permitted to recover from the lessee, who insisted upon keeping the property, damages for the breach of the covenant he had made. That case might bear upon this if the payment of the five cents per ton was rent, but it was a rebate. Furthermore, no recovery could be had for breach of covenant under the pleadings, which rest plaintiff's cause of action upon the agreement to pay rent, not upon breach of contract.

Being of opinion, as we are, that the sums of money plaintiff here claims were rebates and not rental, they cannot be recovered.

The judgment is affirmed.