Northern Liberties Gas Company, Appellant, *v.* United Gas Improvement Company et al.

Argued November 30, 1943. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Robert T. McCracken*, with him *C. Russell Phillips*, for appellant.

*Thomas B. K. Ringe*, with him *Kenneth B. Anderson, Wm. Clarke Mason*, and *Morgan, Lewis & Bockius*, for appellees.

OPINION BY MR. JUSTICE LINN, January 3, 1944:

It is well established that a lessee will not be held liable for his lessor's taxes unless the obligation is stated in "clear and specific terms:" *Catawissa R. R. Co. v. Phila. & Reading Ry. Co.*, 255 Pa. 269, 271, 99 A. 807, and cases following it. A "covenant by a lessee to pay the income taxes of the lessor is not within the terms of the contracts unless the obligation is clearly and directly specified." *U. S. v. Warren Ry. Co.*, 127 F. 2d 134, 136 (C. C. A. 2d, 1942). "Unless the lease expressly provides for the payment of taxes on the income from rentals received under the lease, the imposition of such a burden on the lessee is not justified." *Brainard v. N. Y. C. R. R.*,

242 N. Y. 125, 132, 151 N. E. 152; see also, *Young v. Illinois Athletic Club,* 310 Ill. 75, 141 N. E. 369; *Boston & Providence R. R. v. Old Colony R. R.,* 269 Mass. 190, 195, 169 N. E. 157; *Illinois Central R. R. Co. v. Indianapolis Union Ry.,* 6 F. 2d 830, 836 (C. C. A. 7th, 1925). The application of that principle requires affirmance of the judgment.

The suit is by Northern Liberties Gas Company against United Gas Improvement Company and The Philadelphia Gas Works Company to recover $3,698.13 with interest from September 15, 1942, being an instalment of federal income and excess profits tax on that day paid by Northern Liberties Gas Company for 1941. Plaintiff alleges that the defendants had agreed to pay the tax, had defaulted, and were therefore obligated to reimburse plaintiff. There is no dispute of fact.

The first instrument executed by Northern Liberties and United Gas is dated July 2, 1900. Northern Liberties was then engaged in the business of operating its gas manufacturing plant and distributing its product through its mains and pipes in a certain section of the city. The contract recited that Northern Liberties desired "to avail itself of the capital, skill, and experience of [United Gas] in the conduct of its business." The parties agreed that United Gas should be employed as the Northern Liberties Company's "agent to conduct and carry on its business and accomplish the purposes of" its charter. United Gas agreed "to take possession of and to operate for it . . . its gas works . . . with its mains, pipes, and all and singular the appurtenances, rights, privileges, and appliances belonging thereto, and all its corporate property, real and personal, and to manufacture, distribute, and sell gas, and to collect moneys therefor, for the full term of ninety-nine years from the 30th day of June, 1900." It agreed "to perform said services for and during the term aforesaid, and to pay from the receipts of the said business to be carried on by it as aforesaid to [Northern Liberties], the sum of thirty-

eight thousand dollars ($38,000) per annum in [speci-fied installments] and also to provide and furnish the [Northern Liberties] the money required to pay and discharge all taxes and assessments in the nature thereof, whether federal, state, or municipal, of whatsoever kind or nature which may at any time hereafter be imposed upon said property, and also all taxes which the said Northern Liberties Gas Company may be compelled to pay at any time hereafter during the continuance of this contract upon its capital stock or business of any kind or in any manner. . . and also to pay to said [Northern Liberties] the sum of one thousand dollars ($1,000.) per annum, . . . for the expenses of maintenance of the organization of [Northern Liberties]. And [United Gas] further agrees, in consideration of said employment for said term, that if said receipts should be less than the amount required to make said payments . . . then that it will, from its own moneys and irrespective of the receipts from the said business thereupon make up, furnish, and pay the amount requisite to cover said deficiency . . . [United Gas] hereby guaranteeing and assuming the payment of said thirty-eight thousand dollars ($38,000.) per annum, and said sum of one thousand dollars ($1,000.) per annum for said expenses of organization, and said taxes and assessments in each and every year, irrespective of the receipts, and covenanting hereby to pay the same."

For its compensation, United Gas became "entitled to appropriate to its own benefit all moneys which it shall receive from said business during said term . . . subject to the payment by [United Gas] to or for the account of [Northern Liberties] of the various sums of money specified" above. It agreed to pay the cost "of maintenance and operation of plant, manufacture and sale of products, purchase of supplies, extension of street mains, services, street lamps, additions and renewals of apparatus, improvement of plant, and every other item of expense of like character hereafter incurred . . ."

Northern Liberties agreed to "pay all its debts, except as herein provided, and that during the term of this contract it will do all needful acts to maintain its corporate existence and its franchises; . . ."

At the end of the "term . . . [United Gas] shall return to [Northern Liberties] all the property, real and personal, possession whereof shall be given to it under this contract, in the same good order and condition as when received, except in so far as the same may have been changed, removed, replaced, or altered under this agreement . . ." and additions, etc., paid for by United Gas "shall be the property of [Northern Liberties] at the termination of this contract without repayment."

By an instrument dated May 14, 1937, Northern Liberties consented to an agreement made by United Gas and The Philadelphia Gas Works Company, and agreed that ". . . Philadelphia Gas shall be the agent of Northern Liberties, in place of United Gas." This agreement provided: "United Gas guarantees full performance by Philadelphia Gas of all its obligations under the said Agreement (Exhibit A hereto) and further guarantees the full payment to Northern Liberties of the annual sums, taxes and assessments specified in Section 'Second' of said July 2, 1900 contract irrespective of the receipts from the Northern Liberties business."

Very briefly stated, what happened was that Northern Liberties turned over its plant and business to United Gas for a 99-year term on United's promise to maintain and operate it and pay the specified taxes and $39,000 a year to Northern Liberties, retaining the surplus receipts, if any.

United Gas and Philadelphia Gas paid the income and excess profits tax assessable against Northern Liberties until June 13, 1942, when they gave notice that they had been advised they ". . . were under no obligation, under the agreement dated July 2, 1900, to pay your Federal Income Tax, your Federal Corporation Excess Profits Tax and your Pennsylvania Corporate Net

Income Tax," and that they would not pay the install-ment payable September 15, 1942. This suit followed.

It is unnecessary, for present purposes, to char-acterize the relations of the parties as similar to those of lessor and lessee, or otherwise, because, in any view, the covenant transferring tax liability from the party normally liable to another must be construed in the light of the familiar rule stated above.

The question is whether the contract requires United Gas to pay the tax assessed on the yearly payment made by it to appellant, or, stated differently, whether the ob-ligation to pay the income tax is "within the clear and specific terms" of the contract. The provision is that United Gas shall "pay and discharge all taxes and as-sessments in the nature thereof, whether federal, state or municipal, of whatsoever kind or nature, which may at any time hereafter be imposed upon said property . . ." We interrupt at this point to observe that income and excess profits taxes are not taxes on the property (compare *Reese Inc. v. U. S.*, 75 F. 2d 9, 10 (C. C. A. 5th, 1935) turned over to United Gas and subsequently main-tained, which, as preceding sections of the contract show, was the plant, etc., to be operated, etc., by United Gas. After the word "property," the contract continues that United Gas shall pay ". . . all taxes which the said Northern Liberties Gas Company may be compelled to pay at any time hereafter during the continuance of this contract upon its capital stock or business of any kind or in any manner . . ." It will be conceded, we assume, that the taxes in question are not on capital stock. This leaves for consideration whether the words "or busi-ness of any kind or in any manner" considered with the other provisions of the contract outlined above, clearly and specifically include an obliagtion to pay income taxes. The word "business" in that phrase means the business theretofore described in the contract as the busi-ness of Northern Liberties, which was to be conducted by United Gas and, subsequently, was in fact conducted by

it. "In general, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons." 3 Williston, Contracts, (Rev. ed. 1936) section 618, p. 1780. Here there is no such reason for giving the word "business" two meanings. Shortly stated, the parties agreed that United Gas should pay the taxes on the property, capital stock and business of Northern Liberties conducted and operated by United Gas. There was no agreement, certainly none expressed in clear and specific terms, to pay any tax on the yearly payment of $39,000 to be made to Northern Liberties. Appellant's suggestion is that its receipt of the yearly payment constituted doing business within the meaning of the tax covenant. We must reject the contention as ignoring the meaning attributed throughout the contract to the word "business." A similar suggestion was rejected in *Boston & Providence R. R. v. Old Colony R. R.*, 269 Mass. 190, 197, 169 N. E. 157, by Chief Justice RUGG who said, "There would be an inescapable incongruity in interpreting a tax on 'business' in the lease to include an income tax when for other purposes the lessor is held not to be conducting business." Appellant's business of maintaining and operating a gas works had been delivered to United Gas which then conducted the business; it was the tax on that business, once conducted by appellant but after 1900 by appellees, and from the conduct of which appellant had retired, which is meant by the words,[1] as the rest of the contract shows. If they had in-

---

[1] On this subject Judge FLOOD, in the court below, said, "Since the gas works was to be operated by defendant under the contract as plaintiff's agent, the maintenance and operation of the gas works is still plaintiff's business. If so, it seems to us that this case is indistinguishable from those cases construing an agreement to pay taxes on the business carried on on the demised premises. If that be true, the obligation does not include the payment of income taxes, but contemplates only the payment of taxes imposed upon the operation of the business by the lessee or agent so that the annual payment turned over to the lessor or principal is the full amount specified in the agreement."

tended to require United Gas to pay the tax on the yearly payments to be made to appellant, they could have specified that obligation, as the parties did in *North Pennsylvania R. R. v. Phila. & Reading Ry.*, 249 Pa. 326, 95 A. 100, and in *Phila., Germantown & Norristown R. R. v. Phila. & Reading Ry.*, 265 Pa. 325, 108 A. 528, or, as they did in *Phila. City Passenger Ry. v. Phila. Rapid Transit Co.*, 263 Pa. 561, 107 A. 329, where they provided that lessee should pay the tax for which the lessor would be liable on its earnings or profits.

Both sides refer to decisions of this court illustrating the application of the principle that we must apply. In *Catawissa R. R. Co. v. Phila. & Reading Ry.*, 255 Pa. 269, 99 A. 807, in *Sharon Ry. Co. v. Erie R. R. Co.*, 268 Pa. 396, 112 A. 242, and in *Continental Passenger Ry. v. Phila. Rapid Transit*, 263 Pa. 564, 107 A. 390 (to mention only some of them), it was held that the words did not clearly impose liability and for that reason recovery was denied. On the other hand, in *North Pennsylvania R. R. v. Phila. & Reading Ry.*, 249 Pa. 326, 95 A. 100, and in *Phila., Germantown & Norristown R. R. v. Phila. & Reading Ry. Co.*, 265 Pa. 325, 108 A. 528, where the lessee had agreed to pay taxes on the yearly payments to the lessor, it was held that the liability had been sufficiently stated; so, too, in *Phila. City Passenger Ry. v. Phila. Rapid Transit Co.*, 263 Pa. 561, 107 A. 329, the words included the tax on lessor's "earnings . . . or profits," and were held to show the lessee's obligation to pay the income tax. If the contract had provided that United Gas should pay the taxes assessed against the yearly payment to be made to appellant or on its earnings and profits, i.e., its income, the case would be controlled by these three decisions.

Confronted by these applications of the rule, we must of course hold that the promise to pay the tax on "business of any kind or in any manner" cannot be regarded as a statement in clear and specific terms imposing the obligation to pay the taxes on annual income of $39,000

whether it be regarded as income in the nature of rent or as the price of the privilege of acting as appellant's operating agent; compare *U. S. v. Warren Ry. Co.*, 127 F. 2d 134 (C. C. A. 2d 1942) ; *Boston & Providence R. R. v. Old Colony R. R.*, 269 Mass. 190, 169 N.E. 157; *Young v. Illinois Athletic Club*, 310 Ill. 75, 141 N. E. 369.

The appellant makes a secondary contention based on the conduct of the parties after the enactment of the income tax statutes. For some years prior to 1937, these taxes were paid by United Gas; after 1937 they were paid by Philadelphia Gas. These payments, it is said, evidence an interpretation of the contract as requiring the Philadelphia Gas to pay these taxes.[2] The rule is familiar that "When the terms of a contract are doubtful or capable of two different interpretations, the meaning put on the instrument by the parties themselves may be shown and will be enforced by the courts. . . . Where, however, the contract is not ambiguous or uncertain in its terms, and the intention of the parties, as disclosed by its provisions, is not doubtful, the construction acted upon by the parties is not controlling and will not be enforced by the courts" : *Tustin v. Phila. & Reading Coal & Iron Co.*, 250 Pa. 425, 435, 95 A. 595; *State Line & S. R. Co. v. Lehigh Valley R. R. Co.*, 277 Pa. 227, 233, 120 A. 829.

From what has already been said concerning the provision relied on, it is clear, we think, that there is neither ambiguity nor uncertainty in the terms of the contract where the inquiry is, as it must be, whether the agreement to pay income tax has been stated in clear and specific terms.

We all agree that the judgment must be affirmed.

---

[2] In a number of reported cases it appears that such taxes were paid for considerable time before the payor discovered that there was no liability. *U. S. v. Warren R. R. Co.*, 39 F. Supp. 135, 137 (D. C. N. Y. 1941) ; *Brainard v. N. Y. C. R. R. Co.*, 242 N. Y. 125, 151 N. E. 152; *Stony Brook R. R. v. Boston & Maine R. R.*, 260 Mass. 379, 157 N. E. 607; *Boston & P. R. R. v. Old Colony R. R.*, 269 Mass. 190, 169 N. E. 157; *Young v. Illinois Athletic Club*, 310 Ill. 75, 141 N. E. 369.