456 A.2d 552

**READING TERMINAL MERCHANTS ASSOCIATION, John ASTERIS, Trustee Ad Litem, Appellant,**

**v.**

**SAMUEL RAPPAPORT ASSOCIATES.**

**READING TERMINAL MARKETS, INC.**

**v.**

**READING TERMINAL MERCHANTS ASSOCIATION, By John ASTERIS, Trustee Ad Litem, Appellant.**

Superior Court of Pennsylvania.

Argued March 2, 1982.

Filed Feb. 4, 1983.

Petition for Allowance of Appeal Denied June 3, 1983.

166

168

Robert S. Esposito, Philadelphia, for appellant.

Leon Silverman, Philadelphia, for appellee.

Before WIEAND, BECK and HOFFMAN, JJ.

BECK, Judge:

In this consolidated action we are asked to determine the obligations of hold over tenants after they have been notified of a change in the terms of their lease but before they have agreed to that change.

The facts, largely stipulated by the parties, relate to the area in Philadelphia between Arch and Filbert streets, at Twelfth street, popularly known as the Reading Terminal Market. The Reading Terminal merchants have contributed variety and color to the city's downtown area since before the turn of the present century, offering an abundance of excellent fresh foods and unusual delicacies to local shoppers and commuters. We recognize that the market itself has played an important role in the history of Philadelphia's mercantile life, and agree with J. Chalfin, of the court below, that the merchants "were members of a unique association that, historically, drew customers to a particular location based on a local, and quite favorable reputation" (R. 28).

In August 1976, Railroad Market Inc. (hereafter Landlord) leased the premises known as the Reading Terminal Market from the Trustees of the Reading Company. Samuel Rappaport Associates is the managing agent for Landlord. The terms of the lease allows Landlord to sublease to the merchants who occupy the various stalls of the premises and who are known, collectively, as Reading Terminal Merchants Association (hereafter Tenants).

In 1976, almost all of the member merchants of the Association were already tenants in the market, occupying

their various stalls on month to month leases from the Reading Company. The terms of the existing leases between the merchants and the Reading Company required the lessees to pay for all electricity actually consumed, as registered by their separate electricity meters, at the prevailing retail rate.[1] Despite the clear words of the lease, however, the Reading Company never charged the merchants for electricity actually consumed. It was their ongoing practice to charge the merchants a flat monthly charge for electricity, an amount less than their obligation would have been by the actual terms of the lease. Furthermore, the leases between the merchants and the Reading Company did not impose any liability for real estate taxes on the lessees.

On September 24, 1976, in accordance with the notice provision of the lease,[2] Landlord sent a letter to each of the Tenants, notifying them that their present leases would terminate as of November 1, 1976, that new leases would be negotiated with the Tenants, and that during the period of negotiation they would be tenants at will.[3] Landlord also sent each of the Tenants on September 24, 1976, a new

1. Paragraph 2 of the original lease:
 Lessee shall and will, within ten days after the same shall be come due and payable, pay all bills rendered for electricity consumed on the said premises during the term of this lease or any extension or renewal thereof and until the flow thereof shall be stopped by the proper authorities.

2. The relevant section of the original lease reads:
 "Unless either party shall give to the other written notice of an intention to terminate ... at least 30 days prior to the end of the term ... this lease shall continue upon the same terms and conditions ... PROVIDED that if Lessor shall have given 30 days written notice prior to the expiration of any term hereby created of an intention to change the terms ... and Lessee shall hold over after such notice ... *Lessee shall be considered Lessee under the terms ... as mentioned in such notice* for such further period as Lessee may remain in possession ... [Emphasis added].

3. The notification letter, in pertinent part, is as follows:
 This is formal notice to you that your present lease which is a 30 day lease is hereby terminated as of October 31, 1976. We shall immediately begin to negotiate new leases with you. The new

forty-four page lease (unexecuted) which required payment for individual consumption of electricity as measured by separate meters,[4] and for a proportionate share of real estate taxes based on the square footage of the tenancy.[5] The provisions of the new lease were reiterated and explained orally to each lessee. Tenants objected to the new clauses and refused either to sign the new lease or to pay the increases in their obligations to Landlord. Subsequently, some tenants signed "Form Fifty" leases with Landlord, which required payment of the disputed charges. All the Tenants continued to occupy their stalls, and the ensuing dispute between Landlord and Tenants gave rise to the actions which are now before us on appeal.

> leases will necessarily provide for rental increases and for an overall approach to the market. During the period of time that the negotiations are carried on, you will be considered as a tenant at will, but be allowed to remain in your present location at the present rent. Beginning November 1, we hope to have new leases finalized with each of you.

**4.** Paragraph 4(a) of the new lease:

> 4. *Additional Rent.*
> (a) *Electrical service.* Lessee shall pay as rent all charges for electricity consumed by Lessee, which electricity is separately metered. Lessee shall pay for same at the prevailing retail rate and shall remit the amount due on a monthly basis ten (10) days after presentation of the bill for same from Lessor. In the event that said bill is not paid within the time set forth herein, Lessor shall be under no obligation to continue to furnish to Lessee electrically service but may after ten (10) days notice at Lessor's sole discretion terminate all power provided to lessee.

**5.** Paragraph 4(c) of the new lease:

> (c) *Taxes.* Lessee shall pay its proportionate share of all real estate and city and school taxes assessed against the land and building forming the Reading Market, of which the demised premises is a part. Lessee's proportionate share shall be determined by the percentages set forth above for determining the percentage of insurance premiums due from Lessee. Lessee shall pay his proportionate share of any and all other taxes or substitutes therefore which shall pursuant to present or future law or otherwise be levied, charged or assessed, imposed upon, or grow or become due or payable out of or in respect of or become a lien on the Reading Market or of the building or land of which the demised premises is a part or on the buildings or improvements now or hereafter erected upon the ground on which the present market and adjoining parking lot or the sidewalks and street adjacent thereto.

On May 30, 1978, Landlord demanded retroactive lump sum payments of electricity actually consumed from (in most cases) April 1, 1976,[6] to the date of the demand. Tenants invoked the prior custom and usage of the old leases and continued to remit level payments rather than the amount billed based on actual consumption. Landlord then notified the Tenants of his intention to terminate electrical service if at least ten per cent of the alleged underpayment of $37,000 was not paid by December 12, 1978.

On December 12, 1978 the Tenants filed the first of the actions underlying this appeal. They successfully petitioned the Court of Common Pleas in Philadelphia to issue a preliminary injunction against Samuel Rappaport Associates, preventing the termination of electrical services. The injunction was followed by a consent decree in which Landlord and Tenants agreed to a payment schedule for ten per cent of the disputed overdue charges (R. 10a, 17–8a). Landlord guaranteed uninterrupted electrical service pending the outcome of further litigation on the balance of the amount claimed. At no time did Landlord seek to evict the Tenants.

On March 5, 1979 a second action was initiated, this time by Landlord, who filed a petition for declaratory judgment in which the obligations of the tenancy for taxes and electricity would be construed in light of the facts and applicable law. The two cases were consolidated in March 1979, and tried before the Court of Common Pleas sitting in equity in 1980. The contested period for the payment of real estate taxes begins November 1, 1976 (following Landlord's notice letter of September 1976) and extends to the time that a tenant either signed a "Form Fifty" lease or (if the tenant did not sign such a lease) until the present. The contested period for electricity charges begins April 1, 1976 (prior to the notice) and continues until the time of Land-

6. The significance of this date is never explained in the record below. It is four months prior to Railroad Market Inc.'s lease with the Reading Company, and seven months before Landlord's notice to Tenants became effective.

lord's demand for lump sum payment and the ensuing legal action.

The lower court found for the Landlord. Exceptions were filed and the court sitting *en banc* dismissed the exceptions and issued a final order in Landlord's favor for electricity and real estate tax arrearages.

Appellant Tenants principal contention is that after the Landlord's notice of intent to terminate the month to month leases, and intent to negotiate new leases, those who remained in possession of the premises were tenants at will, and that in these circumstances, until explicitly agreements were reached in new leases, the law implies a lease on the same terms as the former one. Therefore, they argue, no Tenants are obligated to pay real estate taxes or additional sums for electricity until new written leases are executed which impose such obligations. Landlord claims that the letter of notice, accompanied by a copy of the new lease itself, constituted unambiguous notice to the Tenants of new terms which, by remaining in possession, they accepted and are bound by.

The issues which must be addressed are the legal effect of (1) the communications from the Landlord of September, 1976; (2) the Tenants remaining in possession thereafter; (3) the acceptance of payment or rent subsequent to notice; and (4) the prior performance of Tenants and the Reading Company under the old leases.

When a tenant remains in possession after the termination of a lease, the landlord has the choice of treating such a tenant as a trespasser, subject to summary ejectment; as a tenant by suffrance; or as a tenant holding over. *Witmer v. Exxon Corp.*, 495 Pa. 540, 434 A.2d 1222 (1981). For a tenancy to result from a holding over, the landlord must exercise his election, indicating his consent to the tenancy. Usually this consent will be manifest by accepting rent. *American Law of Property*, § 3.33. We are faced in this appeal with a hold over tenancy in which the terms of the tenancy are disputed.

■ The law is clear that when a tenant is possession under a lease continues as a hold over tenant, the law implies a new lease on the same terms and subject to the same covenants and conditions as those contained in the original lease. *Pfingstl v. Chenot*, 165 Pa.Super. 222, 67 A.2d 649 (1949). However, if such hold over tenant continues in possession after receiving notice from the landlord of a change in the terms of the lease, the holding over is construed as acceptance of the new terms. *Worrell v. Rosenberry*, 74 Pa.Super. 152 (1920). If the lessor gives written notice of intent to change the terms and the lessee does not give notice of intent to vacate, the lessee is subject to the terms and conditions of the notice. *Diamond v. Drucker*, 177 Pa.Super. 226, 110 A.2d 820 (1955). Were it otherwise, lessees could hold lessors hostage by the simple expedient of remaining in possession, thus effectively preventing landlords from modifying any terms of a lease for an indefinite period of time. Tenants would be legally able to obtain a perpetual lease on the former terms, subject only to the Landlord's right to bring an action in ejectment.

Tenants argue that the present dispute is governed by *Pfingstl*, where the tenant refused the terms of the new lease offered by the landlord and the court found that the tenant's continued occupancy did not impliedly consummate an agreement to the proposed new terms. Tenants also argue that the Landlord's acceptance of payment as the old terms during the hold over tenancy constitutes an acquiescence in the continuing validity of the original lease, and a concession by the Landlord of the Tenants' right to remain under the previous terms. They also claim that Landlord's letter of September 24, 1976 (see note 2, *supra*) is insufficiently precise to constitute necessary formal notice of change in terms.

■ We do not believe that Tenants' reliance on *Pfingstl* is well-founded. In *Pfingstl*, the tenant continued in occupancy after notice, paying the old rent, for some five years, without any additional correspondence from the landlord. When the tenant moved, after the five year period, the

landlord sued for the increased rent he had previously demanded. This Court held that evidence was too meager to determine the terms, if any, of a new lease. The case was remanded to determine, in a new ,trial, the terms governing the tenancy. Here, on the other hand, Landlord acted promptly and unequivocally to make his demands clear. Tenants' claim of insufficiently clear notice fails, since the new lease was sent to them on the same day as the letter of notification, and Landlord subsequently explained the terms to each tenant individually (R. 18, 37a).

■ We also reject Tenants' contention that Landlord's acceptance of rent constitutes acquiescence in a continuation of the old lease during the hold over. In fact, Tenants have paid the new increased monthly rent and are only disputing the terms relating to electricity and taxes. (R. 38a–39a). Landlord has not acquiesced in the nonpayment of the disputed charges but has acted vigorously to assert his claims.

Of the two contested clauses, we consider first the liability for real estate taxes. Tenants argue that *Northern Liberties Gas Company v. United Gas Improvement Co.*, 348 Pa. 433, 35 A.2d 284 (1944) stands for the rule that a lessee has no liability for lessor's real estate taxes unless the obligation is stated in specific terms. We disagree that *Northern Liberties* is applicable to the instant facts. In that case, the lessee (who was not a hold over) was clearly obligated to pay real estate taxes by the terms of the lease, and the Supreme Court held that an unstated obligation to pay the lessor's income taxes would not be implied.

■ In recent years, rising real estate taxes have placed a financial burden on all who own or lease land within the city. Whether the taxes themselves are absorbed by the landlord or transferred to the tenants by the terms of a lease is determined by the contract between the parties. In this instance, the law maintains that notice by Landlord to Tenants of the tax obligation, followed by continued possession by the hold overs, results in Tenants' liability for the

taxes during the disputed period, i.e. from November 1, 1976 up to the time a tenant either signed a "Form Fifty" lease or (if no such lease was signed) until the present.

■ We now turn to the disputed claim for electricity charges. Landlord claims he is entitled to payment retroactively to April 1, 1976, arguing that the clear terms of the old leases entitle him to payment for individual consumption as measured by the separate meters. Tenants contend that the long period of past payment of level charges creates an implied covenant to continue at that rate. Tenants fail to notice an important distinction in contract law between cases in which parties have agreed on a term, and cases in which they have remained silent as to a material term or have discussed the term but did not come to an agreement. The law will imply a term only for omitted covenants. There can be no implied covenant as to any matter specifically covered by the written contract between the parties. *Greek v. Wylie*, 266 Pa. 18, 109 A. 529 (1920).

■ Nevertheless, we do not agree with the lower court that Tenants have an obligation for electricity charges prior to the period of effective notice, i.e. November 1, 1976. We maintain that a landlord cannot sit on his rights for an extended period (in this case, the many years when flat monthly rates for electricity were collected) and then exact additional payment retroactive to any notice of his intent to do so. J. Chalfin, in his concurrence, addressed the issue of whether the long prior course of dealing between Landlord and Tenant could modify the electricity clauses. He concluded (although the result displeased him) that because there is no ambiguity in the words of the old and new leases, prior course of dealing does not survive to modify the terms.

■ While we do not accept Tenants' argument based on implied covenant, we do not believe that the tenants' claim that they do not owe individual electricity charges must be entirely rejected. A lease may be modified by parol, or a landlord may be estopped by his conduct to enforce a

particular provision of a lease. *Sferra v. Urling*, 188 A. 185, 324 Pa. 344 (1936) (holding that oral modification of the terms of a lease may be supported by course of conduct).

█ Although ordinarily a promise by a creditor to release a debtor from part of liability is unenforceable without consideration, under certain circumstances a party may be estopped, by his conduct, statements, or even silence, to enforce his entire claim, if the other party has been induced to act or forbear and in fact does so in reliance of creditor's action or absence of action. The doctrine of promissory estoppel will then be applied to enforce the waiver of the contractual condition so that the party who relied upon the promise will not suffer a serious injustice. *Fried v. Fisher*, 328 Pa. 497, 196 A. 39 (1938).

█ Because Tenants had always paid level monthly electricity charges for the period preceding the notice of September 1976, we conclude that Landlord is estopped to collect any retroactive payment prior to the time that the notice became effective, i.e. November 1, 1976.

█ We must now consider whether Landlord can collect for increased electricity charges for the period following November 1, 1976. We do not find that Landlord's acceptance of level payments after November 1, 1976 was a waiver of a claim for payment of the larger sum, since Landlord contested the sufficiency of the level payments and took action to make his claim good. We therefore conclude that tenants are obligated to Landlord for the cost of electricity actually consumed from November 1, 1976 until the end of the disputed period.

We affirm the judgment of the lower court imposing liability for real estate taxes on the Tenants. As to that part of the judgment which imposes liability for individually consumed electricity from April 1, 1976 until receipt of landlord's letter of May 30, 1978, we affirm in part and reverse in part. We hold that tenants are not obligated to pay increased electricity charges prior to November 1, 1976.