635 A.2d 191

MIDWAY TERRACE, INC.

v.

Cliff FOLEY and Cheryl Foley, Appellants.

Superior Court of Pennsylvania.

Argued Sept. 21, 1993.

Filed Dec. 16, 1993.

Zenford A. Mitchell, Aliquippa, for appellants.

Kathleen J. Poulos, Beaver, for appellee.

Before ROWLEY, President Judge, and TAMILIA and JOHNSON, JJ.

ROWLEY, President Judge:

Cliff and Cheryl Foley appeal from the final decree granting appellee Midway Terrace, Inc., possession of Lot 19 in Midway Terrace Mobile Home Park and finding appellants liable for rent and late charges in the amount of $3,562.00. Appellants raise the following issues in this appeal: (1) whether the trial court erred in failing to find that appellee violated section 398.4 of the Mobile Home Park Rights Act ("the Act"), 68 P.S. § 398.1 *et seq.*, by charging appellants full rent for a lot space which is approximately one-half the size of other lots in the park; (2) whether the trial court erred in failing to find that appellants were only required to pay one-half the rent claimed by appellee after accepting appellee's "counter-offer" in that regard; and (3) whether the trial court lacked subject matter jurisdiction over this action where appellee failed to give proper notice, as required by the Act, before commencing eviction proceedings. After reviewing the record and considering the parties' arguments, we affirm the final decree.

On January 5, 1990, appellee filed a complaint against appellants with a district justice of the peace seeking judgment for possession and rent due. The district justice found in favor of appellants, and appellee filed an appeal in the Court of Common Pleas. After a bench trial, the trial court issued a decree nisi granting appellee possession of Lot 19 in its mobile home park and directing appellants to pay the rent due and late charges. On January 27, 1993, the trial court denied appellants' post-trial motions and entered a final decree. Appellants then filed this timely appeal.

We adopt the following findings of the trial court as they are supported by the record:

1. The Plaintiff, Midway Terrace, Inc., operates a Mobile Home Park known as Midway Terrace Mobile Homes Park, in New Sewickley Township, Beaver County, Pennsylvania.

2. The Park consists of 24 lots with roads, water treatment facilities, water distribution facilities, sewage disposal and electric utility distribution system and facilities.

3. The Park was never formally laid out and the size of the lots therein vary.

4. The Defendants, Cliff Foley and Cheryl Foley, have had possession of Lot 19 in Midway Terrace Mobile Home Park since 1986 pursuant to the lease.

5. The Defendants have occupied a mobile home on Lot 19 since 1986. The title certificate of the mobile home is in the names of the mother and step-father of the Defendant, Cheryl Foley.

6. At the time the Defendants were married, they could not purchase the mobile home with installment payments because they had no credit history.

7. The down payment on the Defendants' mobile home was made by the mother and step-father as a wedding gift. The Defendants have an oral arrangement with the mother and step-father under which the Defendants make monthly payments to them in the amount of the loan payments the mother and step-father contracted for. When all payments

have been made, the title certificate to the mobile home is to be transferred to the Defendants.

8. The Plaintiff's Vice President and Manager of the Mobile Home Park, Emil Vild, prepared a written lease for Lot 19 which the Defendants signed on January 4, 1988. (Plaintiff's Exhibit 1).

9. The lease was for a term of one year ending December 31, 1988 for $1,560.00 payable in monthly installments of $130.00 and contained a provision converting the terms to month to month at the expiration of the initial term, reserving to the Plaintiff the right to increase the rent upon thirty (30) days advance notice.

10. At the time the lease was negotiated, there was no discussion between the parties as to the size of Lot 19 and the writing does not describe Lot 19 in any manner other than lot number.

11. Sometime in June 1988, a dispute occurred between the Defendants and the tenants occupying adjoining Lot 23 as to the location of the boundary line between the two lots.

12. The Park Manager, Emil Vild, resolved the dispute by placing a stone marker to establish the boundary line. As a result of Mr. Vild's action, the size of Lot 19, as it had been used by the Defendants before the dispute, was reduced. The size of Lot 19 has been approximately one-half the size of other lots in the park since that time.

13. Following the establishment of the boundary line, Mr. Vild unilaterally reduced the monthly rent on Lots 19 and 23 to one-half. He sent a notice to the Defendants (Defendants' Exhibit A) that, effective July 1, 1988, their monthly payment would be $64.50, including charges for refuse removal, water monitor and discount.

14. By written notice, the Defendants were advised by Mr. Vild that future rent would be determined by 'home count' and not lot size. The notice indicated that, effective September 1, 1989, the Defendants' rent would be the same as other home owners in the park—$144.00, including refuse charge. The notice as [sic] mailed by Certified Mail and the

Return Receipt was signed by the Defendant, Cheryl Foley, and delivered on July 29, 1989.

15. The Defendants paid $67.00 in early September 1989 to the Plaintiff.

16. By written notice dated September 15, 1989, (Plaintiff's Exhibit 13), Mr. Vild advised the Defendants they failed to pay rent or related charges for the month of September in the amount of $67.00 and they would be evicted if the sum was not paid within thirty (30) days.[1] The notice was mailed by Certified Mail and the Return Receipt was signed by the Defendant, Cheryl Foley and delivered on September 16, 1989.

17. Following receipt of that notice, the Defendants made an additional payment to the Plaintiff in September in the amount of $67.00.

18. The Defendants paid no rent in October 1989 because they had paid $67.00 twice in September, contending the Plaintiff could not charge the same rent as a full lot when their lot was about one-half size.

19. Commencing November 1989 and each month thereafter down to the present time, the Defendants' monthly rental payments have been one-half of that charged by the Plaintiff to all other mobile home owners leasing lots in the Park.

20. On December 6, 1989, Mr. Vild mailed written notice to the Defendants by Certified Mail, Return Receipt Requested, postage prepaid, that they had not paid rent or related charges for the month of November 1989 in the amount of $154.00 and would be evicted if that sum was not paid within thirty (30) days. (Plaintiff's Exhibit 4).

21. Plaintiff's Exhibit 4 was returned January 5, 1990 by the Postal Service undelivered after notices to the Defendants on December 6, December 11 and December 21, 1989 and January 4, 1990.

1. For the sake of accuracy, we note that the notice stated that appellants would be evicted if the amount was not paid within either twenty or thirty days.

22. On January 4, 1990, Mr. Vild mailed a written second notice to the Defendants by Certified Mail, Return Receipt Requested, of non-payment of rent and that eviction proceedings were being commenced against them immediately. The notice was delivered to the Defendants on January 5, 1990.

23. On January 5, 1990, the Plaintiff filed its Complaint against the Defendants with District Justice Lewis E. Kirchner seeking judgment for possession of Lot 19 and for rent due to that date in the amount of $365.00.

24. The amount of the Plaintiff's monthly rental charges has no relationship to the sizes of lots in the Park but is directly related to other factors such as the cost of providing and maintaining roads, lighting, water service, mail boxes, utilities and similar services to tenants in the park as well as the number of persons residing on the lots in the Park.

25. The Plaintiff's decision to charge the Defendants the full rather than one-half the monthly rent was not made for the purpose of forcing the Defendants to move from the Park.

26. Each time the Plaintiff increased monthly rental charges in the Park since September 1, 1989. [sic] the increases were uniform throughout the Park and the required notices were given prior thereto.

27. The Defendants have not paid rental and late fees claimed by the Plaintiff to be due in the amount of $3,562.00 as of June 1992.

Adjudication (Kunselman, J.), 7/30/92, at 1–5 (footnote added).

█ Appellants first contend that appellee failed to comply with the Act by charging them full rent for a lot which is approximately one-half the size of other lots in the park. The section of the Act upon which appellants rely provides, in relevant part, "All rules or rental charges shall be uniformly applied to all mobile home residents or prospective mobile home residents of the *same or similar category.*" 68 P.S. § 398.4 (emphasis added). Appellants argue:

The Appellants in this case are not and cannot be considered as being in the same category as other mobile home residents in the same park. The Appellants are denied one half (½) the same property interest as other residents in the same park, and therefore, cannot be considered equal to other residents receiving double the Appellants [sic] space at the same rent demanded by the Appellee. The Appellee's charges cannot be uniform if the Appellants are not of the same category as other residents of the park who receive double the space at the same rent.

Appellants' Brief at 15.

Our review of the statutory language and the legislative history, as well as our review of similar statutes in other states, provides no guidance as to what the legislature meant by the phrase "mobile home residents or prospective mobile home residents of the same or similar category." However, we conclude that the legislature did not intend to require mobile home park owners to base their rental charges on the same square footage cost for all of the lots in the park.

First, when attempting to ascertain the intent of the legislature, we may consider the purpose of the statute, as well as the mischief to be remedied and the object to be obtained. *See* 1 Pa.C.S. § 1921(c). With this in mind, we consider the following:

The purpose of [the Mobile Home Park Rights Act] is to give special protection to mobile home owners in mobile home parks. One reason for the distinction between mobile home park owners and other landlords is the hybrid type of property relationship that exists between the tenant who owns the home and the landlord who rents only the lot on which the mobile home sits. In most instances, a mobile home owner in a park is required to remove the wheels and anchor the home to the ground in order to facilitate connections with electricity, water and sewerage. Thus it is only at substantial expense that a mobile home can be removed from a park with no ready place to go. The legislature, while recognizing the right of the mobile home park owner to establish and publish reasonable rules and regulations

relating to tenants in the park, has sought to prevent arbitrary evictions at a substantial expense to park residents.

*Malvern Courts, Inc. v. Stephens,* 275 Pa.Super. 518, 522, 419 A.2d 21, 23 (1980) (footnote omitted). The result sought by appellants, that is, a requirement that park owners base rental charges on the square foot area of each lot, will in no way further the goal of preventing arbitrary evictions and the resulting expenses to park residents.

Moreover, we presume that the Legislature "does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S.A. § 1922(1). If we were to conclude that the legislature intended that rental charges vary among lot sizes, absurd and unreasonable results could follow. First, the evidence reveals, and the trial court found, that appellee's rental charges are not related to the sizes of the lots, but rather, to factors such as "the cost of providing and maintaining roads, lighting, water service, mail boxes, utilities and similar services to tenants in the Park as well as the number of persons residing on the lots in the Park." Trial Court Opinion at 5.[2] There is no evidence in the record from which we could conclude that the size of the lot is a relevant basis upon which to calculate rent. Therefore, to conclude that rent must vary with the size of the lot would be unreasonable.

In addition, we agree with appellee that absurd consequences would result because the courts "would be required to adjust and calibrate the mobile home lot rents of 'mobile home park residents' on-the basis of lot size and other attributes of desirability." Appellee's Brief at 18. While appellants wanted to pay less rent because of their lot size, another resident might want to pay less rent because of the location of his or her lot. Similarly, other residents might want to pay less rent because they have unsatisfactory views, or they live in high traffic areas, or they are subject to undesirable noises or odors because of the locations of their lots. There are a multitude of factors upon which residents could argue that rent should be

---

**2.** We note that appellants do not claim that they were provided with less of these services than other residents.

based. The Act does not require owners of mobile park homes to evaluate those factors and calculate rent accordingly.

Furthermore, the legislature specifically stated that rules and rental charges shall be uniformly applied to *residents or prospective residents* of the same or similar category. If the legislature had intended that rental charges be based on physical characteristics of mobile home park lots, it could have required that rules and rental charges be uniformly applied to all *mobile home park lots* of the same or similar category. The Act does not set forth factors which park owners must take into consideration in determining rental charges. The Act only requires that mobile home park owners not discriminate among *residents or prospective residents of the same or similar category.* Contrary to appellants' assertion, the Act does not require park owners to distinguish among residents who lease different sizes, shapes and locations of lots.

Additionally, although the Act prohibits owners or operators of mobile home parks from applying rules and rental charges differently among residents of the same or similar category, it does not require the converse. That is, the Act does not require owners or operators to apply rules and rental charges differently among residents of different categories, as long as residents of the same or similar category are treated the same. Therefore, contrary to appellants' assertions, the Act does not require park owners to calculate rent for each lot based on the square foot area of the lot.

In conclusion, we do not construe the phrase "residents of the same or similar category" to relate to the size of the residents' lots. Appellee was therefore not required to reduce appellants' rent, and appellants were not excused from paying full rent for their lot.

■ Appellants next argue that the trial court erred in failing to find that they were only required to pay one-half rent after they accepted appellee's counter-offer in that regard. Their reasoning is as follows:

When the Appellee offered one half of the space at one half the rent that was originally proposed to the Appellants in

their January 4, 1988 lease agreement on June 20 [sic] 1989 ..., the Appellee made a counter-offer in [sic] which the Appellants had the power to accept or decline.... The Appellants accepted the Appellee's counter-offer and performed on that agreement by paying one half of the rent of other mobile home residents in the park. The Appellee attempted to rescind the lease contract between the parties on July 28, 1989, and proposed a new offer to the Appellants.

However, the Appellants never accepted the Appellee's new offer issued July 28, 1989. Instead, the Appellants made a counter-offer to the Appellee by sending a one half rent payment on September 1, 1989. This amount was accepted by the Appellee....

Appellants' Brief at 16–17 (footnotes omitted). Appellants' argument is meritless for the following reasons.

As an initial point, we agree with the trial court's conclusion that "[w]hen the lease was negotiated, the parties did not bargain for a lot of any particular size." Adjudication at 18. The record reveals that appellee agreed to lease Lot 19 to appellants and that there was no discussion as to the size of that lot. Cheryl Foley herself testified that the size of the lot was never discussed, that she did not inquire about the size of the lot, and that the adjacent lot was already occupied when she and her family moved onto Lot 19. The only discussion which occurred prior to the dispute with regard to the size of the lot was when Mrs. Vild told appellants where to cut the grass.

Additionally, appellants' characterization of appellee's unilateral decrease in the rent as a counter-offer which they accepted is misplaced. The lease clearly provided that at the expiration of its one-year term, the tenancy would be deemed a month to month tenancy and that appellee would have the right to increase the rent upon thirty days advance notice. At the time appellee decreased the rent, appellants were occupying their lot as month to month tenants. Appellee was not required to obtain their permission or agreement to either decrease or increase the rent. When appellee unilaterally

decreased the rent, there was no binding contract between the parties with regard to the amount of the rent subsequent to December 31, 1988. Similarly, when appellee increased the rent in September of 1989, appellants' agreement with the new rental charge was not required. Accordingly, appellee had the authority to increase the rent in September of 1989 pursuant to the lease agreement. By increasing the rent in September of 1989, as it was entitled to do, appellee was not making an *offer* to appellants. Therefore, appellants' payment of only one-half the rent was not a "counter-offer" which appellee accepted. We reject the assertion that appellee was required to forego the one-half payment in order to preserve its claim for full payment where appellee clearly pursued that claim.

Furthermore, we disagree with appellants' contention that the trial court erroneously relied on *Reading Terminal Merchants Ass'n v. Samuel Rappaport Assocs.*, 310 Pa.Super. 165, 456 A.2d 552 (1983). This Court's discussion in *Reading Terminal* provides support for the trial court's decision. *See* Adjudication at 18–21. Appellants' mere assertion that that case is distinguishable because it involved commercial rather than residential leases is conclusory and unpersuasive.

Finally, appellants contend that the trial court did not have subject matter jurisdiction over this action because appellee did not comply with the notice provisions of the Act. Because we conclude that proper notice was given to appellants, we need not decide whether an owner's failure to comply with the notice provisions of the Act divests the court of jurisdiction over an eviction action.

Section 398.3 of the Act, entitled "Evictions," provides in relevant part the following:

(a) A mobile home resident shall only be evicted for any of the following reasons:

(1) Nonpayment of rent.

\* \* \* \* \* \*

(b) A mobile home resident shall only be evicted in accordance with the following procedure:

\* \* \* \* \* \*

(2) Prior to the commencement of any eviction proceeding, the mobile home park owner shall notify the mobile home park resident in writing of the particular breach or violation of the lease or park rules by certified or registered mail. (i) In the case of nonpayment of rent, the notice shall state that an eviction proceeding may be commenced if the mobile home resident does not pay the overdue rent within 20 days from the date of service if the notice is given on or after April 1 and before September 1, and 30 days if given on or after September 1 and before April 1 or an additional nonpayment of rent occurring within six months of the giving of the notice may result in immediate eviction proceedings.

68 P.S. § 398.3.

The record reveals that on September 16, 1989, appellants received from Mr. Vild a notice stating that they had failed to pay rent or related charges for the month of September in the amount of $67. The notice further stated: "You will be evicted if this sum is not paid within [20] [30] days, or if you again fail to pay rent when due within (6) months of this notice." As appellants' observe, the notice sent by Mr. Vild did not specify whether they would be given a twenty day or a thirty day cure period.[3] Nonetheless, under the circumstances of this case, the notice was not invalid due to Mr. Vild's failure to specify a cure period of either twenty days or thirty days.[4] Appellants were clearly under notice that they

3. The notice was apparently drafted so that it could be used throughout the year as it provided for both twenty day and thirty day cure periods. However, Mr. Vild failed to specify which period was applicable.

4. Mr. Vild's failure to specify either a twenty day or a thirty day cure period would be relevant if the twenty day cure period applied and appellants paid their rent between the twentieth day and the thirtieth day. In that situation, appellants could argue that they had not been given proper notice that they were required to pay their overdue rent within twenty days. However, in the present case, appellants never paid their overdue rent, and eviction proceedings were not commenced

could be evicted if they again failed to pay their full rent within the following six-month period.

After receiving the notice on September 16, 1989, Mrs. Foley sent another payment of $67. Although appellants contend in their appellate brief that that payment was rent for the month of October, that assertion is belied by Mrs. Foley's testimony that she sent the second $67 payment in order to pay full rent in September. Nonetheless, appellants are not entitled to relief regardless of whether they intended the second payment in September to be for September's rent or for October's rent. If the second payment was for the rest of September's rent, they cured their default. However, they failed to pay any rent in October and they failed to pay their full rent in November and December. If, on the other hand, the second payment in September was for October's rent, appellants not only failed to cure the default, they also failed to pay full rent in October, November, and December. Within six months of the receipt of the notice on September 16, 1989, appellants again failed to pay their full rent. Therefore, they were subject to immediate eviction proceedings.

Although Mr. Vild subsequently sent another notice on December 6, 1989, entitled "First Notice of Rent Non–Payment," stating that appellants would be evicted if November's rent was not paid within thirty days or if they again failed to pay their rent within six months, that notice was unnecessary under the Act. Because appellants again failed to pay their full rent within six months of receipt of the notice on September 16, 1989, appellee was entitled to commence eviction proceedings immediately.

Furthermore, appellants cannot successfully argue that they were misled by the notice Mr. Vild sent on December 6, 1989, because it was returned to Mr. Vild when appellants failed to respond to the four notices sent by the post office. For these reasons, appellants were properly notified on September 16, 1989 that if they again failed to pay their rent within six months they would be evicted. When appellants again failed

for more than three months after appellants received the notice on September 16, 1989.

to pay their full rent, appellee properly commenced eviction proceedings against them. Because proper notice was given on September 16, 1989, the question of whether jurisdiction is lacking when proper notice is not given, although interesting, is moot.

For the above reasons, we affirm the final decree in favor of appellee.

Final decree affirmed.